Peter G. GRAV & Arlene L. Grav, etc., et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 716–85C.

United States Claims Court.

March 4, 1988.

Robert E. Hayes, Sioux Falls, S.D., for plaintiffs.

Eric L. Miller, with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, Director, and Thomas W. Peterson, Asst. Director, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

The plaintiffs, Peter and Arlene Grav, seek relief from a decision of the Secretary of Agriculture, through the Commodity Credit Corporation, denying them participation in the Milk Diversion Program. 7 U.S.C. § 1446(d) (Supp. I 1983). The merits of the case are currently before the court on the parties' cross motions for summary judgment. Prior to oral argument on the motions for summary judgment, however, the court asked for briefs and oral argument on the question of whether this court could exercise jurisdiction. Pursuant to this request the defendant submitted a motion to dismiss on November 2, 1987. For the reasons given below, the court denies the motion to dismiss and finds that jurisdiction is properly lodged in this court.

In addition, the court grants summary judgment, on the issue of liability, in favor of plaintiffs.

### Facts

The Milk Diversion Program under which plaintiffs seek relief is part of a milk price support program within the jurisdiction of the Secretary of Agriculture. 7 U.S.C. § 1446(d) (Supp. I 1983). Under the program, qualified dairy farmers and the Secretary of Agriculture enter into contracts to reduce production in return for money payments. The primary goal of the program is to stabilize the milk market in the United States through a reduction in the supply of milk. Congress recognized that the most effective method of reducing the milk supply was to reduce the number of producing milk cows. Thus, Congress, as one requirement for entry into the program, required that:

> any dairy cattle that would or could have been used by the producer for the production of milk if the producer had not entered into and complied with such contract shall not have been sold, leased, or otherwise transferred to another person after November 8, 1983, except as permitted by the Secretary up to November 29, 1983, in order to further the purposes of this Act, or unless such cattle are sold for slaughter or sold or transferred to another producer [who is also a participant in the program] ... or the sale or transfer of any dairy cattle if the Secretary determines that such sale or transfer does not result in adversely affecting the purpose of the program....

7 U.S.C. § 1446(d)(3)(B)(iii) (Supp. I 1983). This section was designed to insure that participants actually removed cows from production, rather than merely affecting a transfer of producing milk cows from one producer to another.

The plaintiffs here were dairy farmers during September of 1983. In September of 1983 they entered into an oral agreement to sell seven head of cattle to Mr. Ken Goodale, a non-participant in the Milk Diversion Program. Mr. Goodale was to make payment and pick the cattle up from the Grav farm no later than February 1, 1984. Although the physical transfer of the cattle was not to take place until sometime in the future, the parties at the time of the oral agreement had agreed upon a price and identified the cattle to the contract. Mr. Goodale actually picked up and paid for the cattle on January 9, 1984.

At the time of the agreement, the Grav's had a herd of 147 head of cattle. The Grav's sold all but the seven head of cattle in question here for slaughter. On January 9, 1984, the Gravs made application to the Milk Diversion Program, which was eventually denied on December 5, 1984, on the grounds that the Gravs had transferred cattle after November 8, 1983, in violation of 7 U.S.C. 1446(d)(3)(B)(iii) (Supp. I 1983).[1] The plaintiffs have exhausted all administrative remedies.

### Discussion

#### A. Jurisdiction

The plaintiffs allege that this court's jurisdiction is founded upon an Act of Congress or an implied-in-fact contract pursuant to the requirements of the Tucker Act, 28 U.S.C. § 1491(a)(1) (1982).[2] The Tucker Act has long been construed to provide jurisdiction only over those Acts of Congress which mandate payment. *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The court believes

---

1. The Gravs application was first denied on March 12, 1984. However, on August 7, 1984, the Secretary, based upon incorrect information that the seven cattle were picked up by Mr. Goodale prior to January 1, 1984, granted the Gravs admission to the program. Then on September 25, 1984, the Gravs admission to the program was reconsidered and denied on the basis of information that the cattle were actually picked up on January 9, 1984. Reconsideration of the September 25, 1984, decision was denied on December 5, 1984.

2. Initially, the court notes that plaintiffs' reliance upon 28 U.S.C. § 1491(a)(3) (1982) is misplaced. That portion of the Tucker Act, as noted by the Federal Circuit in *United States v. J.C. Grimberg Co.*, 702 F.2d 1362 (Fed.Cir.1983), applies only "when a claim over which the court has jurisdiction (implied contract under (a)(1)) is filed in the court before a contract has been awarded." *Id.* at 1367. Thus, section 1491(a)(3) acts as a grant of pre-award equitable powers rather than a statute enlarging this court's jurisdiction.

the Act in question here does so mandate. Furthermore, the court is of the opinion that an implied-in-fact contract was created in this case. Plaintiffs' argument that the statutory language found in 7 U.S.C. 1446(d)(3)(A) (Supp. I 1983) is an offer by Congress to any milk producers in the contiguous United States is well-taken. If the statute is construed as an offer, then the statute is clearly an Act of Congress mandating payment to plaintiff such as is necessary for jurisdiction to be lodged in this court. Also plaintiffs' actions in being both qualified for and manifesting an intent to enter into the Program created an implied-in-fact contract.

The statutory language upon which plaintiffs rely reads:

The Secretary shall, not later than January 1, 1984, provide for a Milk Diversion Program under which the *Secretary shall offer* to enter into a contract, at any time up to February 1, 1984, with *any producer of milk in the United States* for the purpose of [reducing milk production] . . . (emphasis added)

A reading of the statute such as that urged upon the court by plaintiffs follows from an application of the plain meaning rule and a reading of the legislative histo-ry. The first stop when examining a statute for legislative intent is the plain language of the statute itself. *Freese v. United States*, 6 Cl.Ct. 1 (1984), *aff'd* 770 F.2d 177 (Fed.Cir.1985). The particular question here then is whether Congress meant that a producer's application "shall be considered an offer by the producer to enter into a contract to participate in the Milk Diversion Program," as the Secretary's regulations specify,[3] when it wrote "the Secretary shall offer to enter into a contract . . ."

The defendant argues adamantly that such is the case. However, to follow defendant's argument would be wholly inconsistent with the plain meaning of the statute. The language "the Secretary shall offer to enter into a contract . . ." is very clear. It, unlike the regulations promulgated, and Form CCC–150, does not ask for a contractual offer from any milk producer.[4] Rather, the statute by its plain language, allows *any* qualified producer in the United States to enter into a contract with the Secretary. Thus, a producer who meets the statutory criteria contained in 7 U.S.C. §§ 1446(d)(3)(B)(i)-(iv) (Supp. I 1983) *must* be accepted into the program without question by the Secretary.[5]

**3.** This language is taken directly from Form CCC–150, the application form for entry into the Milk Diversion Program. Authority for such language follows from the Secretary's regulations. 7 C.F.R. 1430.403(b) (1986).

**4.** See 7 C.F.R. 1430.430(b) (1986) which reads "Eligible producers may offer to enter into a contract with CCC by executing a contract and submitting it to the county ASCS office not later than January 31, 1984."

**5.** Those sections enumerating the contract requirements read:

(B) Each such contract shall require that—
(i) the producer shall reduce the quantity of milk marketed for commercial use in an amount equal to a percentage specified by the producer, but not less than 5 per centum nor more than 30 per centum, of the quantity of milk marketed by such producer for commercial use during the marketing history period described in subparagraph (F).
(ii) any production capacity of a facility that becomes available for use because a producer reduces milk production in order to comply with the contract shall not be used by the producer, or made available by the producer for use by any other person, for the production of milk;
(iii) any dairy cattle that would or could have been used by the producer for the production of milk if the producer had not entered into and complied with such contract shall not have been sold, leased, or otherwise transferred to another person after November 8, 1983, except as permitted by the Secretary up to November 29, 1983, in order to further the purposes of this Act, or unless such cattle are sold for slaughter or sold or transferred to another producer with respect to whom there is in effect a contract entered into under this subsection, except that the Secretary may, to the extent practicable and to the extent deemed consistent with the goals of the diversion program, permit the sale of registered, purebred cattle for breeding purposes subject to such terms and conditions as the Secretary may prescribe based on a history of such sales by the producer or the sale or transfer of any dairy cattle if the Secretary determines that such sale or transfer does not result in adversely affecting the purpose of the program; and
(iv) the producer shall repay to the Secretary the entire payment received under this para-

Unlike the typical invitation to make an offer in an advertisement, there is no discretion to accept or reject "any" qualified producer. Thus, the statutory language and scheme has all the attributes of a contractual offer. *Lefkowitz v. Great Minneapolis Surplus Store*, 251 Minn. 188, 86 N.W.2d 689 (1957). To construe the statute as defendant urges would allow the Secretary to exercise discretion when deciding whether to accept or reject otherwise qualified producers. The statutory language, however, is inconsistent with such discretion, just as contractual theory is inconsistent with the ability of the offeror to withdraw the offer after acceptance.

This is consistent with the available legislative history of the Act. Congress recognized that the program would not work unless all qualified milk producers who sought admission to the program were actually admitted. Senate Report No. 98–163 states "the Secretary *must* offer to enter into a contract with *any* milk producer in the United States ..." 1983 U.S.Code Cong. & Admin.News 1658, 1693. Additionally, a summation of Senator Proxmire's statement before the Subcommittee on Agricultural Production, Marketing, and Stabilization of Prices reads "when the Secretary levies a 50–cent deduction, he *must allow any* dairy producer to contract with the ASCS to reduce his anticipated milk marketing from the base ..." *Id.*, 1983 U.S.Code Cong. & Admin.News at 1717. In summing up the major features of the program, the Senate Report stated, "Any producer may participate in the program by entering into a contract with the Secretary to reduce milk production ..." *Id.*, 1983 U.S.Code Cong. & Admin.News at 1659.

The statutory offer in this instance invites performance as the method of acceptance. Thus, the distinction between bilateral and unilateral contracts is important here. A bilateral contract requires a promise for a promise. However, a unilateral contract requires only a promise by one side and acceptance by performance on the

other. Here Congress made the offer through the statute, 7 U.S.C. § 1446(d) (Supp. I 1983), and the plaintiff accepted the offer upon application to the program. The only bars to acceptance which Congress included in the statute were the requirements included in 7 U.S.C. §§ 1446(d)(3)(b)(i)-(iv) (Supp. I 1983), which as seen below, the plaintiff has met.

■ It is the court's conclusion that Congress intended the Secretary to be the offeror under this particular program. Therefore, it follows from this conclusion that Congress mandated that the Secretary enter into contracts, for the payment of money, to *any* producer who qualified for the milk diversion program.

Additionally, the court is of the opinion that an implied-in-fact contract was created. An implied-in-fact contract requires the same mutuality of intent to contract as does an express contract. "Acceptance of an offer must be manifested by conduct that indicates assent to the proposed bargain." *Pacific Gas & Electric Co. v. United States*, 3 Cl. Ct. 329, 338–39 (1983), *aff'd*, 738 F.2d 452 (Fed.Cir.1984). That mutuality of intent was created in no uncertain terms by the statute here. Plaintiffs' applications with their qualification created a binding contract.

This case is akin to *Haupricht Bros., Inc. v. United States*, 11 Cl.Ct. 369 (1986), in which Judge Miller found that this court had jurisdiction over plaintiffs' claim that they were wrongfully denied participation in a similar program. The court's Tucker Act jurisdiction in the *Haupricht* case was based upon a regulation which provided that "the Department of Agriculture will enter into contracts with operators and producers who agree to devote acreage normally planted to wheat ... to a conserving use in return for compensation ..." 7 CFR § 770.1 (1983). This regulation is similar to the statute in question here and the court's analysis in *Haupricht* is equally applicable here.

graph, including simple interest payable at a rate prescribed by the Secretary which shall, to the extent practicable, reflect the cost to the Corporation of its borrowings from the Unit-

ed States Treasury, commencing on the date payment is first received under this paragraph, if the producers fail to comply with such contract.

In *Morgan v. United States*, 12 Cl.Ct. 247 (1987), a case apparently indistinguishable from this one, my distinguished brother on the bench, found that there was no implied-in-fact contract, and hence no jurisdiction, since:

> the allegation is simply inconsistent with the undisputed facts. The application itself, Form CCC–150, explicitly states that it is an offer by the applicant to the government, not the applicant's acceptance of an offer by the government. Furthermore, the program regulations also characterize Form CCC–150 as an offer by the applicant that does not mature into a contract until executed by both parties, and further prescribe that an applicant meet program eligibility requirements.

*Id.* at 251.

While Judge Tidwell's logic is clear and his opinion cogent, this opinion can not agree with his conclusion for two reasons. First, the regulations appear completely inconsistent with the statute. While the statute sets forth an offer in absolute terms, the regulations qualify that offer in a way that the ·Secretary cannot do under our form of constitutional government. It may well be that a statute inadvisably makes an offer rather than the more lawyerly and safer invitation to make an offer. However, it is not for executive branch regulation drafters nor judicial branch judges to correct this decision. Second, our reading of traditional contract theory convinces us that this is a situation where the statute contemplated an acceptance by action (intent combined with the proper qualification). Therefore, a binding contract was created and this court must exercise its jurisdiction.

This court, on the basis of the above discussion, finds jurisdiction over the plaintiffs' claims.

### B. Scope of Judicial Review

■ Defendant further argues that 7 U.S.C. § 1385 (1982) affords finality to the

Secretary's *factual* determination that the Gravs transferred cows after November 8, 1983. This is a misconstruction of the nature of the problem. Section 1385 does preclude judicial review of factual findings, but certainly does not preclude review of the Secretary's definition of the word transfer. This is a question of statutory construction rather than of fact. This is confirmed by the circumstance that there is no dispute here over what actually happened between the Gravs and Mr. Goodale with regard to the physical movement of the cows, or even concerning those parties' actions and promises.[6] Thus, section 1385 does not preclude judicial review in this case.

■ The defendant brings 7 U.S.C. § 1429 (1982) to the court's attention and argues that this section limits the scope of the court's review. Section 1429 reads:

> Determinations made by the Secretary under this Act shall be final and conclusive: *Provided* that the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act. [italics in original]

This section has been interpreted by the Court of Claims to limit review to the question of whether the Secretary has acted rationally and within his statutory authority. *Carruth v. United States*, 224 Ct.Cl. 422, 627 F.2d 1068 (1980), see also *Gibson v. United States*, 11 Cl.Ct. 6 (1986); *Haupricht Bros., Inc. v. United States*, 11 Cl.Ct. 369 (1986). Thus, while review is limited, it is not precluded in a case where plaintiffs allege that the Secretary has promulgated regulations inconsistent with the statutory scheme.

### C. The Merits

#### Was There a Transfer?

■ The plaintiffs' motion for summary judgment turns upon the threshold issue of whether plaintiffs transferred cattle in vio-

---

6. Stipulations of fact for purposes of [the parties'] motion for summary judgment.

(filed July 17, 1986).

lation of 7 U.S.C. § 1446(d)(3)(B)(iii). That section reads:

> Any dairy cattle that would or could have been used by the producer for the production of milk if the producer had not entered into and complied with such contract shall not have been sold, leased, or *otherwise transferred* to another person after November 8, 1983 ... (emphasis added)

This section was enacted to ensure that milk producers make actual reductions in milk production as opposed to the mere movement of milk cows from one producer to another. 1983 U.S.Code Cong. & Admin. News 1675.

The plaintiffs argue that any transfer of cattle took place at the time of the oral agreement. It is undisputed that sometime in September 1983, the Gravs reached an oral agreement for the sale of seven cows with Mr. Ken Goodale. Pursuant to that agreement, which identified the seven milk cows in question to the contract, Mr. Goodale was to pick up and pay for the cows at the Grav farm no later than February 1, 1984.

The defendant on the other hand argues that the cows were transferred on January 9, 1984, the date on which Mr. Goodale actually paid for and picked up the cows.

There are, as far as the court can tell, no cases or statutory materials defining or interpreting the meaning of "otherwise transfer." Thus, the court must rely upon an established maxim of statutory construction to determine the will of Congress. The maxim of ejusdem generis applies here. That maxim counsels that where general terms follow a specific list of enumerated items the meaning of the general term is limited to the same class as those specifically enumerated terms. *Weisbart & Co. v. First National Bank*, 568 F.2d 391 (5th Cir.1978).

In the *Weisbart* case, the court was called upon to interpret the meaning of the term "disposition" in the context of a "sale, exchange or *other disposition*." Applying the doctrine of ejusdem generis the court concluded that " 'other disposition' cannot technically be characterized as a sale or

exchange, at the minimum it must meet the threshold test of these two transactions by effecting a transfer of property." *Id.* at 395. This leads to the conclusion that transfer means something less than *any* physical exchange of property. It is at least limited to something of legal significance rather than physical movement from one place to another. The court's next avenue of inquiry then must resolve the question of when, or what, legal significance attached to the transaction between the Gravs and Mr. Goodale. Plaintiffs argue that a contract for the sale of seven cows was entered into prior to November 8, 1983, and therefore, any transfer occurred on the date of the initial agreement. This argument appears to be borne out under basic contract law.

Since this is essentially a question of when title passed under South Dakota law, the court will look to the Uniform Commercial Code (UCC) as adopted by the South Dakota legislature. Section 57A–2–106 of the South Dakota Codified Law provides that "a sale consists in the passing of title from the seller to the buyer for a price." Section 57A–2–401(3)(b) expands upon the question of when title passes:

> Unless otherwise explicitly agreed where delivery is to be made without moving the goods ... (b) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting.

Clearly, this provision indicates that under South Dakota law, title passed at the time and place of contracting. It is irrelevant when the actual payment for and physical transfer of the cattle took place. Thus, the court finds that the transfer took place in September of 1983 when the agreement was reached and not January 9, 1984, when Mr. Goodale paid for and picked up the cattle.

■ Defendant opposes this position by arguing that the Statute of Frauds under section 57A–2–201(1) of the UCC requires a contract for the sale of goods of a price of $500 or more to be in writing. Reliance upon the Statute of Frauds is misplaced here, however. The Statute of Frauds is a personal defense applicable to disputes be-

tween the parties.[7] It has no place in a case where the contract has been acknowledged and in fact fully performed. It thus has no bearing upon the issue of when title passed between the parties on a fully executed contract. The court must look at the actual transaction, not some hypothetical transaction that was hypothetically contested.

Additionally, defendant argues that the agency interpretation is entitled to great deference. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). *Chevron USA v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Great deference does not amount to absolute deference, however, and in this case the court finds that the agency interpretation is unreasonable and inconsistent with the law. *Chevron*, 467 U.S. at 866, 104 S.Ct. at 2793.

The court agrees with the plaintiffs in this case and concludes that the Secretary's interpretation of "transfer" is inconsistent with the statute.

### CONCLUSION

The court thus denies the defendant's motion to dismiss and grants the plaintiffs' motion for summary judgment on the liability issue.

The parties are directed to confer on the question of how best to proceed on the issue of damages, and to submit a brief joint status report to the court within 45 days detailing the results of such discussions. The court will then schedule a status conference.

If the parties should reach a settlement, they shall notify the court by filing a status report indicating the same.

---

7. Comment (4) to section 2–201 reads:
   Failure to satisfy the requirements of this section does not render the contract void for all purposes, but merely prevents it from being judicially enforced in favor of a party to the contract. For example, a buyer who takes possession of goods as provided in an oral contract which the seller has not meanwhile repudiated, is not a trespasser. Nor would the Statute of Frauds provisions of this section be a defense to a third person who wrongfully induces a party to refuse to perform an oral contract, even though the injured party cannot maintain an action for damages against the party so refusing to perform.