Peter G. GRAV, Arlene L. Grav, and The First National Bank in Sioux Falls, Plaintiffs–Appellees,

v.

The UNITED STATES, Defendant–Appellant.

No. 89–1180.

United States Court of Appeals, Federal Circuit.

Oct. 4, 1989.

Rehearing Denied Dec. 18, 1989.

Suggestion for Rehearing In Banc Declined Dec. 28, 1989.

Robert E. Hayes, Davenport, Evans, Hurwitz & Smith, of Sioux Falls, S.D., argued for plaintiffs-appellees.

Peter G. Barber, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellant. With him on the brief were John R. Bolton, Asst. Atty. Gen., and David M. Cohen, Director.

Before MAYER, Circuit Judge, SMITH, Senior Circuit Judge, and MICHEL, Circuit Judge.

MICHEL, Circuit Judge.

The United States appeals the decision of the United States Claims Court, *Grav v. United States*, 14 Cl.Ct. 390 (1988), granting the Gravs' motion for summary judgment for $50,686.00 to which they were entitled and wrongfully denied under the Milk Diversion Program (MDP), 7 U.S.C. § 1446(d) (Supp. I 1983). The Claims Court denied the United States' (government's) motion to dismiss and cross-motion for summary judgment. We affirm.

## Background

The facts were stipulated by the parties as follows. In September, 1983, the Gravs and Ken Goodale entered into an agreement for the sale and purchase of seven milk cows. A price was agreed upon at this time.[1] Removal of the cows from the Gravs' property in South Dakota was the responsibility of Goodale and had to occur prior to February, 1984. Goodale took possession and paid for the cows on January 9, 1984. On January 9, 1984, the Gravs sold all their remaining dairy cattle for slaughter and applied for participation in the MDP. First National Bank, a secured creditor of the Gravs and the holder of a specific assignment of their right to payments under the MDP, failed to notify or to receive approval from the government of this assignment as required by 31 U.S.C. § 3727 (1982).

The Gravs' application was ultimately denied on December 5, 1984, because the Department of Agriculture's Agricultural Stabilization and Conservation Service officials for the Gravs' county determined that the Gravs were ineligible for the program since they had transferred dairy cattle to a third person after the statutory deadline of November 8, 1983, thereby violating 7 U.S.C. § 1446(d)(3)(B)(iii) (Supp. I 1983). After exhausting all their administrative remedies, the Gravs filed a complaint in the Claims Court seeking relief. A final judgment was entered against the government on October 25, 1988, for $50,686.00.

---

1. According to the Claims Court's decision, the dairy cows were specifically identified and tagged for Goodale at the time of the oral agreement.

## OPINION

Our jurisdiction is based on 28 U.S.C. § 1295(a)(3) (1982), governing "an appeal from a final decision of the United States Claims Court."

### I.

The first issue before us is whether the Claims Court had jurisdiction. The Claims Court's Tucker Act jurisdiction is limited to:

any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (1982). The government argues that the Claims Court did not have jurisdiction because the MDP was not a money mandating statute nor was there an implied-in-fact contract. The Claims Court concluded it had jurisdiction because the language of the statute setting up the MDP offered milk producers a unilateral contract, provided the Gravs met the criteria, which they could accept by performance, or because the MDP statute created an implied contract, provided the Gravs met the criteria, with intent for the government being manifested by the language of the statute and intent for the milk producer being manifested by his application for the program.[2]

Our analysis whether the Claims Court had jurisdiction turns on whether the Secretary of Agriculture was granted discretion to refuse participation by any applicant who was qualified for the program. We conclude the Secretary was not. Therefore, this is a money mandating statute that triggers Tucker Act jurisdiction in the Claims Court.

" '[T]he starting point in every case involving construction of a statute is the

language itself.' " *Watt v. Alaska*, 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)). The language in the first part of the Dairy Production Stabilization Act of 1983 is clear:

The Secretary *shall,* not later than January 1, 1984, provide for a milk diversion program under which the Secretary *shall* offer to enter into a contract, at any time up to February 1, 1984, with any producer of milk in the United States for the purpose of reducing the quantity of milk marketed by the producer for commercial use during the fifteen-month period beginning on January 1, 1984.

Pub.L. No. 98–180, tit. I, § 102(a), 97 Stat. 1128 (1983) (codified at 7 U.S.C. § 1446(d)(3)(A) (Supp. I 1983)) (emphasis added).

Within that same statute, Congress, in section 1446(d)(3)(E), used the word "may" to grant the Secretary discretion to modify contracts if the Secretary "determines that, as a result of contracts entered into under this paragraph, (i) there would be an excessive reduction in the level of milk production in the United States, or (ii) there has been a substantial hardship to producers of beef cattle, dairy cattle, hogs, or poulty [sic] sold for slaughter." Within the statute, Congress appears to use the two words "shall" and "may" to differentiate tasks assigned to the Secretary that were mandatory from those that were discretionary.

"Where the plain language of the statute would settle the question before the court, the legislative history is examined with hesitation to determine whether there is a clearly expressed legislative intention contrary to the statutory language." *Madison Galleries, Ltd. v. United States*, 870 F.2d 627, 629 (Fed.Cir.1989). As was point-

---

**2.** The government cites *Morgan v. United States,* 12 Cl.Ct. 247 (1987), as controlling this case; however, the Gravs' case is factually distinguishable. In *Morgan,* an implied-in-fact contract could not exist in part because, even assuming

mutuality of intent, which the court also found lacking, the applicant failed to meet the eligibility requirements and these requirements were not waived. *Id.* at 252. The Gravs clearly met all eligibility requirements. *See* Section II.

ed out in the Claims Court's opinion, the legislative history supports the interpretation that the statute is mandatory. According to S.Rep. No. 163, 98th Cong., 1st Sess. 36, *reprinted in* 1983 U.S.Code Cong. & Admin.News 1658, 1693, "the Secretary *must* offer to enter into a contract with any milk producer in the United States." (emphasis added).

The government argues that the other language in the last part of 7 U.S.C. § 1446(d)(3)(A) permits the Secretary to reject or accept an application for participation in the MDP. We disagree. That part of the statute merely states:

> In setting the terms and conditions of such contracts, the Secretary shall take into account any adverse impact of the reductions in milk production on beef, pork, and poultry producers in the United States and shall take all *feasible* steps to *minimize* such impact.

*Id.* (emphasis added). The import of this language is only to allow the Secretary to alter the quantities in a contract, but not to permit him to refuse to enter into a contract altogether with a qualified applicant.

Again the legislative history of the Act further supports our conclusion that the Secretary may only alter the terms and conditions of these contracts. The Conference Report states:

> In *setting the terms and conditions* of diversion contracts under this provision, it is the understanding and intent of the conferees that the Secretary is authorized to provide in the contracts for *an adjustment to be made in the level of milk production reduction,* or for such other feasible steps to be taken, at any time during the 15–month period of the diversion contracts as is found to be necessary to minimize the adverse impact that the milk diversion program may have on beef, pork, and poultry producers. In addition to providing *for some adjustment in the level of milk production reduction* under the contracts, the Secretary could include in the contracts,

among other feasible steps, *a limitation on the amount of the milk production reduction* that could be achieved through the sale of dairy cattle for slaughter and *a requirement that a portion of the reduction* be achieved through other means available to producers.

H.R.Conf.Rep. No. 556, 98th Cong., 1st Sess. 29, *reprinted in* 1983 U.S.Code Cong. & Admin.News. 1658, 1752 (emphasis added). The emphasized language speaks only of adjustments and limitations that the Secretary can make to the terms of the contract; the Conference Report does not speak of granting the Secretary the discretion to refuse a qualified applicant participation in the program.

Accordingly, the Claims Court properly ruled it had jurisdiction under the Tucker Act.

## II.

▪ The government also argues that if we determine that the Claims Court properly exercised jurisdiction, the Gravs were ineligible because the Act provided that "any dairy cattle that would or could have been used by the producer for the production of milk if the producer had not entered into and complied with such contract shall not have been sold, leased, or otherwise transferred to another person after November 8, 1983." 7 U.S.C. § 1446(d)(3)(B)(iii) (Supp. I 1983). Since the terms "sold, leased or otherwise transferred" are not defined within the statute and authority to define such words is not delegated to the Secretary, we turn to state contract law to determine if the agreement between the Gravs and Goodale suffices to place the sale date prior to November 8, 1983.[3]

▪ Under South Dakota law, a sale is defined as the passing of title from the seller to buyer for a price. S.D. Codified Laws Ann. § 57A–2–106(1) (1988). The passing of title usually occurs when the seller delivers the goods. S.D. Codified

---

3. Although the government argues that the cows in this case should be considered as "otherwise transferred," we think it plain the transaction exchanging goods for money must instead be considered a "sale."

Laws Ann. § 57A–2–401(2) (1988). However, when "the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting." S.D. Codified Laws Ann. § 57A–2–401(3)(b) (1988). Since the dairy cows were tagged for Goodale at the time of the oral agreement and since he was responsible for picking up the animals and no documents were to be delivered, *Grav*, 14 Cl.Ct. at 391, transfer of title occurred in September, 1983, before the statutory deadline.

### III.

■ The government's motion to dismiss the bank for lack of standing because the bank failed to notify or to receive approval from the government of the assignment by the Gravs of their right to receive payment is moot because the Claims Court granted summary judgment only to the Gravs. The court's opinion designated only Peter and Arlene Grav as the plaintiffs. *Id.* at 390.

Accordingly, the judgment of the Claims Court in all respects is

AFFIRMED.

MAYER, Circuit Judge, dissenting.

The Supreme Court has repeatedly told us that "for claims against the United States 'founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department,' 28 U.S.C. § 1491, a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *United States v. Mitchell*, 463 U.S. 206, 218, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580 (1983); *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976). If the payment of money is permissive, admitting of discretion in the government to pay or not, the legal source of the authority to pay is not "money mandating," it is "money permitting." There is no jurisdiction in the United States Claims Court to entertain a suit on that basis. *Adair v. United States*, 648 F.2d 1318, 1322, 227 Ct.Cl. 345 (1981).

What we have here is enabling legislation directing the Secretary of Agriculture to set up a program by which applicants to the program may receive payments if they meet eligibility requirements, and programmatic standards which the statute entrusts the Secretary to set in the prudent exercise of his discretion. According to Grav, 7 U.S.C. § 1446(d)(3) mandates the payment of money to, and creates an implied-in-fact contract with, all comers to the milk diversion program. This strains logic and does not comport with the plain language of the statute.

In directing the Secretary to establish the MDP, Congress' purpose was to stabilize the market price of milk. But it was also concerned that the increased slaughter of dairy cows could induce instability in related agricultural industries. Congress therefore instructed the Secretary to "take into account any adverse impact of the reductions in milk production on beef, pork, and poultry producers in the United States," and vested in him the authority to "take all feasible steps to minimize such impact." *Id.* § 1446(d)(3)(A).

By Grav's reckoning, "all feasible steps" excludes the ability to reject an application. The court agrees, saying "the import of this language is only to allow the Secretary to alter the quantities in a contract, but not to permit him to refuse to enter into a contract altogether with a qualified applicant." At 1308. But Congress expressly provided the opposite.

Singularly excluded from the measures available to the Secretary is the authority to determine the percent reduction in milk marketing to be undertaken by a producer. As provided in subsection (d)(3)(B)(i), "the producer shall reduce the quantity of milk marketed for commercial use in an amount equal to a percentage specified by the producer...." And, while subsection (d)(3)(E) authorizes the Secretary unilaterally to modify the percent reduction specified for a particular quarter of the contract period, "the aggregate reduction in milk marketed for commercial use for the entire diversion period must continue to be at least equal to the total reduction required by the con-

tract." Moreover, the statute is explicit that the Secretary is not merely to assess the amount of payments to be received by a producer on the basis of the information supplied in an application, but is to determine the producer's "[e]ligibility for diversion payments...." *Id.* § 1446(d)(3)(I).

It is plain, therefore, that the statute does not vest in milk producers a substantive right to receive money from the government. The statute directs the Secretary to solicit the interest of producers in the milk program and contractually to secure their participation, but it commends to his sound discretion the means by which to avert disruption in other sectors of the agricultural economy. Manifestly, those means include the rejection of an application the Secretary deems unduly prejudicial to the balance he is endeavoring to establish. Accordingly, the statute is not money mandating, and the Claims Court has no jurisdiction to hear the complaint of a disappointed applicant to the MDP.

For similar reasons, Grav's implied-in-fact contract theory also fails. Charging the Secretary with the authority to determine an applicant's eligibility for the program, and reserving to him the right to set the terms and conditions of contracts, *id.* § 1446(d)(3)(A), the statute is not an offer that the qualified milk producer can accept upon application. *See Cutler–Hammer, Inc. v. United States,* 441 F.2d 1179, 1182, 194 Ct.Cl. 788 (1971) ("So long as it is reasonably apparent that some further act of the offeror is necessary, the offeree has no power to create contractual relations by an act of his own, and there is as yet no operative offer"). There can be no contract implied-in-fact absent the same mutuality of intent required for an express contract. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed.Cir.1984). Because the Secretary has the discretionary right to decide the terms upon which to accept an application, indeed, to decide whether to accept it at all, the mere submission of an application creates no contract, and the applicant has no basis for

invoking the jurisdiction of the Claims Court.