**Lynn and Keith RIESCHICK, Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 528–88C.**

United States Claims Court.

Oct. 23, 1990.

William E. Metcalf, Topeka, Kan., for plaintiffs.

Agnes M. Brown, Washington, D.C., with whom were David M. Cohen and Acting Asst. Atty. Gen. Stuart Schiffer, for defendant.

OPINION

ROBINSON, Judge:

This case was originally brought in the United States District Court for the District of Kansas (District Court). In its August 31, 1988 memorandum and order the District Court found that plaintiffs' claim was essentially a contract dispute for a sum in excess of $10,000 and that the United States Claims Court (Claims Court) had exclusive jurisdiction pursuant to 28 U.S.C. §§ 1346 and 1491. The District Court transferred the case to this court pursuant to 28 U.S.C. § 1631 for further proceedings.

This case is now before the court on defendant's motion for summary judgment and plaintiffs' motion for transfer back to the District Court or, in the alternative, plaintiffs' cross-motion for summary judgment. Defendant contends that this is a suit under the Tucker Act, 28 U.S.C. § 1491, in which plaintiffs seek money damages from the United States. Defendant moves for summary judgment on the grounds that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Lynn and Keith Rieschick (plaintiffs) move to return this case to the District Court alleging that this court lacks jurisdiction to entertain their complaint in that this is not a contract dispute, but rather a claim for

declaratory and injunctive relief from the promulgation and application of 7 C.F.R. § 1430.455(c)(1). In the alternative, plaintiffs move for summary judgment alleging that the Secretary of Agriculture's (Secretary) promulgation of 7 C.F.R. § 1430.455(c)(1) was unlawful, and its application, as augmented by an informal policy discussed below, to plaintiffs' contract under the Dairy Termination Program (DTP), 7 U.S.C. § 1446(d), was arbitrary, capricious, and an abuse of discretion. Plaintiffs' pray for damages in the amount of $45,000 plus interest and costs. For the following reasons the court will grant defendant's motion for summary judgment and will deny plaintiffs' motion to transfer the case to the District Court, or alternatively, for summary judgment.

### Factual Background

On December 23, 1985, Congress passed the Food Security Act of 1985, Pub.L. No. 99–198, 99 Stat. 1354 (1985) (Act). The Act authorized the DTP as an incentive program to encourage dairy producers to dispose of their dairy stock and to cease milk production for a period of five years. Through the DTP, Congress hoped to permanently reduce the level of commercially marketed milk. Final rules and regulations concerning this program were issued in the Federal Register on March 7, 1986. 51 Fed.Reg. 45, 7913 (1986). These rules were effective on February 10, 1986.

The Commodity Credit Corporation (CCC) administered the DTP for the Department of Agriculture through local Agricultural Stabilization and Conservation Service (ASCS) State and county committees. 7 C.F.R. § 1430.451(a). Under the DTP, the CCC entered into contracts with eligible producers who, in return for monetary reimbursements, agreed to cease milk production for five years by: (1) slaughtering or exporting their herds, and (2) not having any interest in milk or dairy cattle for five years. 7 U.S.C. §§ 1446(d)(3)(A)(ii) and (iv). Prospective participants were permitted to submit bids for three herd disposal periods, but could only be accepted for one. 7 C.F.R. § 1430.456.

Under the DTP, producer reimbursement was determined by multiplying the producer's prior milk production base by their respective bid per hundredweight of milk. Each producer's base was calculated from the lower of milk poundages commercially marketed by the producer for the two 12–month periods ending June 30, 1985 and December 31, 1985.[1] 7 C.F.R. § 1430.455(a). Under 7 C.F.R. § 1430.455(c)(1),[2] this base was reduced by 20,000 pounds for each cow transferred on or after January 1, 1986 for other than export or slaughter. Defendant developed an informal policy permitting participants to escape application of this last provision by repurchasing the exact (not similar) cattle.

DTP bids were submitted on contracts provided by local ASCS offices. The contracts set forth the cow transfer rules, specifically including in the appendix the provisions of 7 C.F.R. § 1430.455(c)(1). Bids could not be withdrawn after the last date for bid submission established by the CCC. 7 C.F.R. § 1430.456(a). When a bid was accepted, a CCC representative signed

---

**1.** If a producer marketed 100,000 pounds of milk for the period July 1, 1984 through June 30, 1985, and marketed 120,000 pounds of milk for the period January 1, 1985 through December 31, 1985, then that producer's base would be the lower amount of 100,000 pounds of milk. This number would then be multiplied by the bid per hundredweight of milk submitted by the producer. For example:

| Producer's Bid | Hundredweight of Milk* | Total Reimbursement |
|---|---|---|
| $10.00 | 1,000 | $10,000 |

\* One hundredweight of milk equals 100 pounds of milk

**2.** Title 7 C.F.R. § 1430.455(c)(1) reads as follows:

(c) Except for dairy cattle slaughtered or exported by the bid date, the preliminary milk base shall be reduced by 20,000 pounds for: (1) Each head of dairy cattle transferred on or after January 1, 1986, but before the bid date, from those units with respect to which any participating producer or related person was a producer on or after January 1, 1986.

the contract (bid) and returned a copy to the participant. 7 C.F.R. § 1430.456(c).

Prior to passage of the Act speculation surrounding the proposed DTP precipitated a decrease in the value of dairy cattle. This diminished the value of plaintiffs' dairy cattle which were being used as collateral to secure their loans at the Farmers State Bank of Circleville, Kansas (Bank). On September 25, 1985, the Bank sent a notice to plaintiffs that their collateral was insufficient and that their line of credit would need restructuring.

During the fall, plaintiffs attempted to resolve this problem with the Bank. Finally, on November 26, 1985, plaintiffs offered to sell certain cattle. However, due to the disruption of market activity caused by speculation over the DTP, plaintiffs were unable to sell any cattle at that time.

After the Act passed there was speculation by the press that the bids accepted under the Act would run between $7.00 and $10.00 per hundredweight of milk. Plaintiffs performed an analysis with the Bank using a bid of $12.50 per hundredweight and determined that this price was not acceptable for their operation. As a result, plaintiffs pursued a course of debt reduction through a planned sale of assets. Under this plan plaintiffs would market 25 bred springer heifers.[3] Plaintiffs were able to sell 10 of these heifers on January 24, 1986.

On February 14, 1986 the local ASCS office mailed out letters to local dairy farmers concerning the DTP. This letter asked interested parties to make an appointment to discuss the DTP, bringing with them their milk marketings from July 1, 1984 through December 31, 1985, and the composition of their dairy herd on January 1, 1985 and January 1, 1986. Plaintiffs made an appointment for February 25, 1986 with the local ASCS office. On February 28, 1986 plaintiffs signed and completed milk market and dairy composition forms which placed their base period market at 951,189 pounds of milk. On March 7, 1986 the final DTP rules were issued and were made retroactively effective to February 10, 1986. Under the final rules plaintiffs were required to reduce their base by 20,000 pounds for each of the ten heifers they sold in January. 7 C.F.R. § 1430.455(c)(1). Plaintiffs' revised base was 751,189 pounds, for which they bid $22.50 per hundredweight. The reduction of 200,000 pounds to plaintiffs' contract base reduced their potential entitlement by $45,000.

On March 7, 1986 plaintiffs submitted bids to the CCC on the ASCS contract form agreeing to a dairy termination with a contract base of 751,189 at $22.50 per hundredweight for all three termination periods. On March 28, 1986 the Secretary accepted all bids for $22.50 per hundredweight or less. On April 1, 1986 plaintiffs' bid was accepted for the first termination period. Upon learning of defendant's informal policy allowing producers to escape the provisions of 7 C.F.R. § 1430.455(c)(1) by repurchasing cattle sold after January 1, 1986, plaintiffs attempted to repurchase the 10 heifers they had sold on January 24, 1986. However, the cattle broker who sold plaintiffs' springer heifers would not relinquish the names of the out-of-state purchasers.

Plaintiffs subsequently appealed the assessed reduction to their contract base resulting from the sale of the springer heifers. On October 1, 1986 the Assistant Deputy Administrator, State and County Operations denied plaintiffs' request. Plaintiffs then filed an action in the District Court seeking review of 7 C.F.R. § 1430.455(c)(1) under the standards set forth in the Administrative Procedure Act (APA). 5 U.S.C. § 701 *et seq.* By memorandum and order dated August 31, 1988, that court determined that plaintiffs' complaint was a contract dispute within the jurisdiction of the Claims Court. Accordingly, the District Court transferred this case to the Claims Court pursuant to 28 U.S.C. § 1631.

## DISCUSSION

### I.

Under the authority of the Tucker Act, the Claims Court may review any claim for

---

**3.** A heifer is a cow which has never had a calf and therefore has never produced milk.

money damages against the United States founded "either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States...." 28 U.S.C. § 1491(a)(1) (1982). The Tucker Act is a jurisdictional statute which "does not create any independent substantive rights enforceable against the United States for money damages." *United States v. Mitchell,* 463 U.S. 206, 216, 103 S.Ct. 2961, 2967, 77 L.Ed.2d 580 (1983); *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). To recover in the Claims Court, a party must demonstrate that the basis for its substantive right to recover money damages exists in some provision of the Constitution, Act of Congress, or executive department regulation in which the Government's sovereign immunity is specifically waived and the consent of the United States to be sued for money damages is stated. *United States v. Mitchell,* 463 U.S. 206, 212–17, 103 S.Ct. 2961, 2965–68, 77 L.Ed.2d 580 (1983). With the exception of pre-award contract challenges, the Claims Court possesses no jurisdiction over suits for injunctions or declaratory judgments. *United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969); *Hoopa Valley Tribe v. United States,* 219 Ct.Cl. 492, 596 F.2d 435 (1979).

▮ In this case plaintiffs maintain that they are seeking declaratory and injunctive relief against defendant in promulgating 7 C.F.R. § 1430.455(c)(1). They argue this court should return this case to the District Court. Plaintiffs also pray for "indirect" damages against the United States for $45,000, plus interest and costs which arise out of their claim for injunctive relief. Defendant contends plaintiffs' claim is a contract action to recover damages in excess of $10,000 over which this court has exclusive jurisdiction.

▮ In determining the nature of this action it is necessary to evaluate plaintiffs' equitable claims. The jurisdiction of a claim is determined by the factual allegations, not the framing of the complaint. While plaintiffs may allege that their suit is a challenge to a federal regulation, the court must determine the true nature of the claim. *Colorado Dept. of Highways v. United States Dept. of Transp.,* 840 F.2d 753, 755 (10th Cir.1988); *Rogers v. Ink,* 766 F.2d 430, 434 (10th Cir.1985); *Amalgamated Sugar Co. v. Bergland,* 664 F.2d 818, 824 (10th Cir.1981). "Several courts have noted that when the "prime objective" or "essential purpose" of the complaining party is to obtain money from the federal Government (in an amount in excess of $10,000), the Claims Court's exclusive jurisdiction is triggered." *New Mexico v. Regan,* 745 F.2d 1318, 1322 (10th Cir.1984). *See also, Hoopa Valley Tribe v. United States,* 219 Ct.Cl. 492, 596 F.2d 435 (1979).

Based upon a review of plaintiffs' complaint and the memorandum and order transferring this complaint from the District Court, it is evident that this action is a contract dispute. This case is very similar to *Amalgamated Sugar Co. v. Bergland,* 664 F.2d 818 (10th Cir.1981), and *Wheeler v. United States,* 3 Cl.Ct. 686 (1983), wherein plaintiffs attempted to characterize their complaints as seeking declaratory relief when they were actually suits for money damages. In the instant case, plaintiffs seek to recover monies which they would have received had the milk base reduction provisions of 7 C.F.R. § 1430.455(c)(1) not been applied to their contract. An attempt to interpret the terms of a Government contract to recover additional funds cannot be characterized other than as a contract action.

In support of their transfer argument, plaintiffs cite *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), alleging that that case permits a challenge to defendant's actions in the District Court, where plaintiffs claim legal rights not arising by virtue of a contract between the parties and where the relief requested is not for money damages. As has been previously discussed, plaintiffs claim is essentially a claim for money damages based upon a contract between the parties, that has been couched in terms of declaratory and injunctive relief for the

purpose of achieving jurisdiction in the District Court.

In any event, *Bowen* does not apply in the instant case. *Bowen* concerned a declaration of entitlement to *prospective* entitlements under a money-mandating statute where plaintiff sought to enforce that statute. In *Bowen*, plaintiff's relationship with defendant was open and ongoing. Here, plaintiffs' claim is for purely *retroactive* relief, not based upon a money-mandating statute, but rather a contract.[4] There is no continuing relationship between the parties. "Under the *Bowen* analysis a claim for money based on a past wrong or past labor does not seek to enforce a statutory mandate." *Wheeling v. United States*, 20 Cl.Ct. 659 (1990). Additionally, *Bowen* principally concerned the effect of §§ 702 and 704 of the APA on the jurisdiction of the federal district courts, and is of limited application to the Claims Court. Claims Court jurisdiction is not governed by the APA. *Wheeling v. United States*, 20 Cl.Ct. 659 (1990).

The underlying purpose of plaintiffs' action is to obtain money in excess of $10,000 based upon plaintiffs' contract with the United States. Clearly, this case falls within the exclusive jurisdiction of the Claims Court.

Finally, plaintiffs make reference to the added difficulty of pursuing this litigation through the Claims Court rather than through local (district) courts. Plaintiffs conclude that "[l]ocal courts should be available for the trial of such matters unless jurisdiction is clearly elsewhere." While the Claims Court sits in the District of Columbia, every effort is made to accommodate the needs of complainants, often at great inconvenience to the court. Out of town counsel may participate in pre-trial conferences and oral arguments telephonically and almost without exception trials are held in the geographic locale which will best facilitate the attendance of plaintiff's and defendant's witnesses in local court-

rooms made available to the Claims Court. The Claims Court has historically made every reasonable effort to minimize the burden upon the parties resulting from its broad geographic jurisdiction. The additional burden on plaintiffs (if any) of Claims Court jurisdiction will be negligible. Consequently, this court finds that jurisdictional arguments in this regard are without merit.

## II.

To grant a motion for summary judgment the court must find an absence of material facts in dispute and an entitlement to judgment as a matter of law. RUSCC 56. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Both parties in this case have submitted motions for summary judgment. The court agrees with the parties that there are no genuine issues of material facts in dispute. The only issues are plaintiffs' allegations that 7 C.F.R. § 1430.455(c)(1) was unlawfully promulgated and applied to plaintiffs' contract. These issues are properly decided as matters of law and, therefore, summary judgment is appropriate.

■ This case concerns the terms of a DTP contract voluntarily entered into between plaintiffs and defendant. Plaintiffs argue that the Secretary acted unlawfully in limiting the milk base of their DTP contract to 751,189 pounds through the application of 7 C.F.R. § 1430.455(c)(1). Plaintiffs argue that they are entitled to a modified contract with a 951,189 pound milk base. Defendants contend that plaintiffs are seeking to reform their contract. They argue that reformation is not a proper remedy for the enforcement of terms to which defendant never assented.

This court is limited in its authority to reform an express contract. "It is well established that the court should not decree reformation unless it has convincing evi-

---

4. 7 U.S.C. § 1446(d)(3)(A)(i) is not money-mandating in that the Secretary *may* offer to enter into a contract with the producer. This is distinguished from the 1984 Milk Diversion Program, 7 U.S.C. § 1446(d)(3)(A) (Supp. I 1983), wherein the statutory language provided that "... the Secretary *shall* offer to enter into a contract ... with any producer of milk in the United States...." (Emphasis added.) *Grav v. United States*, 886 F.2d 1305 (Fed.Cir.1989).

dence that the parties expressed agreement and an intention to be bound in accordance with the terms that the court has been asked to establish and enforce." *Bromion, Inc. v. United States,* 188 Ct.Cl. 31, 411 F.2d 1020 (1969). Plaintiffs have presented no evidence to suggest that either party intended to enter into a contract with a 951,189 pound milk base. Plaintiffs were aware of the terms of the contract and voluntarily elected to be bound by them. Plaintiffs' contract clearly stipulated to the 751,189 pound milk base and, in addition, the terms of the controlling regulation were included in an appendix to the contract. These facts do not support contract reformation.

Under 7 U.S.C. § 1429 the court is also limited in its ability to review the application of 7 C.F.R. § 1430.455(c)(1) to plaintiffs' contract:

> Determinations made by the Secretary under this Act shall be final and conclusive: Provided that the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act.

The standard of review for such determinations is whether the Secretary has acted rationally and within the statutory authority. *Gibson v. United States,* 11 Cl.Ct. 6 (1986); *Haupricht Bros., Inc. v. United States,* 11 Cl.Ct. 369 (1986). Plaintiffs bear the burden of proof that the decision was arbitrary and capricious. Plaintiffs have presented no evidence that application of the regulation to their contract was an abuse of discretion. There is no question that plaintiffs sold 10 springer heifers on January 24, 1986 and, therefore, were subject to the reduction provisions of the regulation.

■ Plaintiffs further argue that nonapplication to their contract of an informal policy that allowed some producers to escape the reduction provisions of 7 C.F.R. § 1430.455(c)(1) was arbitrary and capricious. This argument lacks merit. Plaintiffs did not comply with the terms of the informal policy when they did not repurchase their cattle sold on January 24, 1986, albeit through no fault of their own. Requiring repurchase of exactly the same cattle previously sold rather than allowing substitution of other dairy cattle appears to bear a reasonable relationship to the quantities of milk produced by such cattle.

DTP contracts were based upon each producer's total unit[5] milk production without identifying the contributions of individual cattle. If an individual animal was removed from the unit and sold for other than sale or export it would have been difficult, if not impossible, to precisely identify the change this would have had on the milk poundage production for that unit. Because of this difficulty, undoubtedly the CCC had to assume that any sale of cattle for other than export or slaughter, after the final period from which the milk production base could be established, December 31, 1985, would reduce the amount of milk removed from the commercial market.[6] 7 C.F.R. § 1430.455(c)(1) was enacted to recapture this loss.[7] The informal policy at issue permitted producers to return to their pre-sale position by repurchasing the exact cattle sold. This is a reasonable requirement because repurchase of the same cattle would not be likely to alter the estimated poundage of milk removed from the market. Purchasing substitute cattle might not have the same effect. There was no way to calculate with the same degree of assurance the effect the substituted cattle would have had on a producer's

---

**5.** A unit includes the dairy cattle, milk production facilities, and land used together to produce milk.

**6.** During an October 17, 1990 informal status conference, defendant stated that the Secretary distinguished between those participants who could repurchase the same cattle sold and those who sought to substitute similar cattle, because there was no way to determine the milk pound-

age produced by the original cattle vis-a-vis substitute cattle.

**7.** Plaintiffs' counsel acknowledged during oral argument that the 20,000 pound reduction per cow under 7 C.F.R. § 1430.455(c)(1) was probably a reasonable average estimate of what a dairy cow would produce for the period for which participants were being compensated for nonproduction.

milk production base. The substituted cattle may have been lower or higher milk producers than the original cattle and, therefore, could have decreased or increased the amount of milk removed from production. While the effect upon the program and the commercial market of substituting other cattle would have been different in each particular case, there was a clear need for a fair and uniform policy which would not require the CCC to delve into the individual facts of each case. This could have created an undesirable administrative burden on the CCC either in gathering specific milk production information, or causing speculation as to the effect of the substitution in any given case.

In any event, plaintiffs have failed to show there was no rational basis for the Secretary not to apply the informal policy to plaintiffs. Therefore, the court finds that the Secretary's action in requiring the repurchase of the exact same cattle by plaintiffs was not arbitrary and capricious.[8]

■ Plaintiffs have made a number of additional allegations attacking the legality of the promulgation of 7 C.F.R. § 1430.455(c)(1). Plaintiffs allege that defendant lacked the authority to enact the "penalty provisions" of 7 C.F.R. § 1430.455(c)(1), and that defendant did not meet applicable notice requirements.

The court is subject to a limited standard of review in evaluating the authority for agency regulations enacted under statutory authority. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) states "... if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." "The power of an administrative agency to administer a congressionally cre-

ated ... program necessarily required the formulation of policy and making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), citing *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974).

According to the legislative history of the Act, the purpose for the DTP was to permanently reduce surplus milk production and to cut the cost of the Government milk purchasing program. Thus, the appropriate question is whether as defendant contends, 7 C.F.R. § 1430.455(c)(1) is reasonable when viewed in that context. That question must be answered in the affirmative. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984).

The purpose of the 7 C.F.R. § 1430.455(c)(1) was to prevent windfall profits and to permanently remove cattle from dairy production.[9] This regulation discouraged producers from disposing of cattle in ways other than through export or slaughter as intended under the DTP. 7 C.F.R. § 1430.455(c)(1) was not, as plaintiffs characterize it, a "penalty provision." 7 C.F.R. § 1430.455(c)(1) did, however, provide a disincentive for the sale of cattle in ways which would not reduce the dairy cattle population. Producers were subject to this provision only upon voluntary entry into the DTP. Plaintiffs argue that the regulation's retroactive effect, its application to cattle sales prior to the effective date of the regulation, is unlawful, arbitrary and capricious. However, as stated heretofore, the regulation was retroactively applied to avoid requiring the CCC to engage in fact finding or in speculation to determine the consequences of cattle sales

---

**8.** While this court as a policy matter might disagree with the wisdom of defendant's refusal to expand the exception to permit substitution of other cattle, we cannot conclude as a matter of law that the Secretary's refusal to do so is irrational, arbitrary or capricious.

**9.** As stated in defendant's motion to dismiss, 7 C.F.R. § 1430.455(c)(1) prevented the farmer from making a windfall profit (contracting for disposing of cows which he had already sold), and it ensured that the purpose of the statute—to lower production—was not thwarted by selling the cows rather than killing or exporting them to decrease local production.

on a producer's contract base after the last date (December 31, 1985) from which a producer's base could be determined. Additionally, producers were notified of this requirement prior to becoming contractually bound and could have chosen not to participate in the program. Producers choosing to participate were bound by its terms. Defendant's regulation is a permissible construction of the enacting statute, and a reasonable approach to effectuating and preserving the intent of Congress.

Plaintiffs additionally argue that the notice requirements of 5 U.S.C. § 553 were not met when enacting 7 C.F.R. § 1430.455(c)(1). As cited in defendant's brief the final rulemaking was published in the Federal Register on March 7, 1986. 51 Fed.Reg. 45, 7913 (1986). The preamble to the final rule clearly states:

> Section 201(d)(3) of the Agricultural Act of 1949 (the "1949 Act") provides that the Secretary of Agriculture shall establish and carry out a Dairy Termination Program for the 18-month period beginning April 1, 1986. Section 102 of the 1985 Act provides that the *rulemaking requirements set forth in section 553 of Title 5 United States Code, shall not apply with respect to the implementation by the Secretary of Agriculture of section 201(d) of the Agricultural Act of 1949 (7 U.S.C. § 1446(d)) as amended by section 101 of the 1985 Act, including determinations made regarding the Dairy Termination Program.* (Emphasis added.)

Clearly, the notice provisions of 5 U.S.C. § 553 were not required under the Dairy Termination Program.

### CONCLUSION

Although the court is sympathetic to plaintiffs' circumstances, the court must find that plaintiffs have failed to sustain their burden of proof in support of their motions. Therefore, for the reasons set forth above, the court denies plaintiffs' motions for transfer of the case to the United States District Court for the District of Kansas or, alternatively, for summary judgment and grants defendant's motion for summary judgment.

The Clerk is ordered to dismiss the complaint. No costs.