Margaret O'CONNELL, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 517–86C.

United States Claims Court.

Feb. 17, 1988.

---

John J. Ciavardoni, Albany, N.Y., for plaintiff.

J. Keith Burt, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. Terry Jackson, Office of General Counsel, U.S. Dept. of Agriculture, of counsel.

## OPINION

NETTESHEIM, Judge.

The backdrop for this case before the court after argument on cross-motions for summary judgment is an administrative process that would have invited Franz Kafka to take notes. Plaintiff applied to participate in a program to reduce milk production, and her contract was accepted. After she reduced her herd substantially in reliance on forthcoming contract payments,

the first payment was disapproved. The local governmental office responsible recommended leniency or special consideration, because whatever deficiency in plaintiff's eligibility for payment, all the facts of her proposed operation were made known before she embarked on the program. Relief was denied on appeal, and plaintiff was invited to submit a tort claim, which was denied. Plaintiff was advised that she could appeal again, but after a hearing, it was disclosed that the appellate body had no authority to consider her appeal. A subsequent appeal to the correct appellate authority was denied, and plaintiff was advised that she could file suit under the Federal Tort Claims Act. She filed a tort suit, but her action was dismissed when the Government took the position that her suit could only be brought in the United States Claims Court.

## FACTS

The following facts are undisputed. Plaintiff Margaret O'Connell ("plaintiff") is a milk producer. The Milk Diversion Program was a price support program intended to reduce the total amount of milk produced in the United States in an attempt to stabilize market prices. See 7 U.S.C. § 1446(d)(2) (Supp. I 1983). Under the Milk Diversion Program, the Commodity Credit Corporation (the "CCC") entered into contracts with eligible milk producers to pay them to reduce milk production. 7 U.S.C. § 1446(d)(3)(A)(ii). The United States Department of Agriculture, Agricultural Stabilization and Conservation Service (the "ASCS"), Emergency Operations and Livestock Programs Division, performed the administrative functions of the CCC with respect to the Milk Diversion Program. The contracts with the CCC were administered by the ASCS at a local level by a county committee composed of elected farmers. These contracts required that over a 15-month period from January 1, 1984, through March 31, 1985, a participating milk producer reduce production of between 5 and 30 percent of the 1981–82 base production for the producer's "unit." 7 C.F.R. § 1430.403(a) (1985).[1]

1. The operation of the Milk Diversion Program also was described in *Morgan v. United States,* 12 Cl.Ct. 247, 249–50 (1987).

The Milk Diversion Program was announced in December 1983. On January 31, 1984, plaintiff submitted a proposal to the County ASCS Committee for Albany County, New York (the "county committee"), and the county committee on behalf of the CCC signed a contract with plaintiff for the 15–month term. All pertinent information was disclosed to the county committee, and there is no question that plaintiff or her husband misrepresented the nature or relationship of their respective farming operations, although he failed to sign the contract as a joint producer with an interest in the jointly-owned farm. The pertinent information was that in March 1983 Mr. O'Connell purchased a separate farm and that in October 1983 he moved his herd onto the farm jointly owned by plaintiff and Mr. O'Connell and housed his cows in the jointly-owned facility that was used for plaintiff's herd. The production of Mr. O'Connell's operation did not qualify under the Milk Diversion Program because it was purchased after the base period had concluded. Milk sales for Mr. O'Connell's herd were billed for and paid to him separately, and most sales from plaintiff's herd were billed for and paid to her separately; Mr. O'Connell did not enter into a Milk Diversion Program contract for his herd; plaintiff's Milk Diversion Program contract applied only to her herd and had nothing to do with Mr. O'Connell's herd or its milk production. Mr. O'Connell's herd and plaintiff's herd occupied the same farm, but the milk from each herd was produced separately, stored in separate bulk tanks, and sold separately, thereby making it readily identifiable. Although Mr. O'Connell could not participate in the Milk Diversion Program, he agreed voluntarily to reduce his milk production and did so. It has not been determined, however, whether his voluntary reduction was sufficient so that the commercial milk production for the farm was within plaintiff's reduction proposed for her contract.

By letter dated February 17, 1984, plaintiff was advised by the county committee, per Thomas Della Rocco, Executive Director for the Albany County ASCS Committee, that her contract had been accepted by the CCC as of January 31, 1984. Plaintiff thereafter substantially reduced her milk production, sold 40 cows from the herd for slaughter, and certified the transfers in accordance with the terms of the Milk Diversion Program contract. Sometime before April 17, 1984, someone, it appears at a higher level than the county committee, questioned the arrangement whereby Mr. O'Connell housed his dairy cows in the jointly-owned facility used by plaintiff's cows that were subject to the Milk Diversion Program. The county committee, through Mr. Della Rocco, on April 17, 1984, requested approval to pay plaintiff her first Milk Diversion Program payment. On April 27, 1984, the ASCS State Executive Director for New York denied approval because plaintiff's and Mr. O'Connell's dairy cows were housed together. Mr. Della Rocco notified plaintiff of this decision by memorandum dated May 4, 1984. On May 16, 1984, the New York State ASCS Committee advised the county committee that it concurred with the State Executive Director's decision.

The county committee met with the O'Connells and forwarded to the New York State ASCS Committee its unanimous recommendation by memorandum of May 8, 1984, stating, in pertinent part: "The events leading up to the ... MDP sign-up make this an exceptional case; a case in which the strict execution of rules works against the intent of the ... [MDP] and the participant." The county committee, according to the memorandum, deemed the two units readily identifiable, in that there were two farms, two milking facilities operated up to October 1983, and two separate farms used for the production of feed for each operation. In its view the county committee could allow plaintiff to participate either by forcing her husband to remove his diary cows to the newly purchased operation or by allowing both to continue milking in one barn and to continue to keep separate production records. The county committee decided against the former option, because removing his herd would force Mr. O'Connell to increase his milk production to early 1983 levels in or-

der to meet the cost of operating out of another barn, which would be in direct conflict with the purpose of the Milk Diversion Program.

On June 4, 1984, the District Director reviewed that "Milk Diversion Program discrepancy" with Mr. Della Rocco and noted: "I feel that if Mr. or Mrs. O'Connell had been informed of their not meeting the unit requirement, when they enrolled, they would have withdrawn their enrollment...."

■ As noted, the New York State ASCS Committee agreed with the State Executive Director's decision denying approval of payments. By letter of June 6, 1984, the county committee advised plaintiff that she could appeal to the New York State ASCS Committee. On June 21, 1984, plaintiff appealed and on July 5, 1984, the State Executive Director wrote plaintiff that after reviewing the matter with the District Directors and Mr. Della Rocco, "it was mutually agreed that your MDP appeal should be handled as a relief case...." Plaintiff was advised that the county committee would recommend the amount of relief; that the recommendation would be sent to the New York State ASCS Committee for review; and that the recommendation would then be forwarded to Washington, D.C., to the ASCS Deputy Administrator for State and County Operations (the "DASCO") for decision. The county committee memorandum of July 17, 1984, recommended relief in the amount of $55,800, representing increased costs of operation and lost profit rather than program benefits.[2]

By memorandum of August 1, 1984, the Albany State Executive Director, upon the recommendation of the county committee, recommended to the DASCO through the Northeast Area Office that plaintiff "be compensated for losses incurred by her through the misinformation/misaction of the County Committee." On August 9, 1984, the DASCO concluded that plaintiff's contract must either be cancelled or corrected to include her husband as a joint producer and suggested that if plaintiff wanted to file a tort claim she should be sent the requisite form. This advice was communicated to plaintiff by memorandum of August 17, 1984. On August 22, 1984, plaintiff advised the county committee that she exercised her option by cancelling her contract as of that date. The cancellation of the contract was confirmed by the New York State Executive Director on September 7, 1984.

On August 22, 1984, as suggested, plaintiff also lodged an administrative tort claim, which was denied by the ASCS Office of the General Counsel on March 18, 1985. The county committee by memorandum of March 29, 1985, to the State Executive Director sought reconsideration of the decision: "We feel the county committee system and its grassroots approach in administering the farm program [are] being compromised with this determination by the Office of General Counsel."

Sometime after April 17, 1985, the New York State ASCS Committee allowed plaintiff an opportunity to appeal the denial of her tort claim to the New York State ASCS Committee. A hearing was scheduled for May 15, 1985. The minutes of the hearing, at which plaintiff and her husband participated, disclose that the New York State ASCS Committee lacked authority to "approve" plaintiff's appeal, proposing, instead, that a waiver be granted regarding the housing of Mr. O'Connell's dairy cows. Plaintiff was advised by letter of May 17, 1985, from the State Executive Director that her appeal was denied and that she could appeal the denial to the DASCO. Plaintiff appealed on May 28, 1985. In

---

2. This relief in the nature of consequential damages represented 40 animals sold due to Milk Diversion Program $20,000; delayed breeding loss (12 cows purchased) $10,800; loss of profit due to Milk Diversion Program $25,000—total loss $55,800. Defendant's position is well taken that plaintiff failed to support her motion for summary judgment insofar as she claimed consequential damages. *See Loftin v. United States,* 6 Cl.Ct. 596, 611 (1984), *aff'd,* 765 F.2d 1117

(Fed.Cir.1985) (denying lost profits from slaughtered cattle); *see also H.H.O., Inc. v. United States,* 7 Cl.Ct. 703, 707 (1985). The State Executive Director advised on August 31, 1984, that plaintiff would have been able to earn up to $59,557 throughout the full term of the Milk Diversion Program if her contract had been valid. Damages in this type of action would be limited to program benefits for which plaintiff qualified.

connection with the appeal, plaintiff participated in a hearing by telephone on July 10, 1985. She also made written submissions on July 15, 1985. By letter of August 20, 1985, the DASCO denied her appeal, finding that there was no basis for reinstating her in the Milk Diversion Program, since all producers on the dairy unit were not participating and had not signed the Milk Diversion Program contract.

Plaintiff commenced an action in federal district court under the Federal Torts Claims Act, and her lawsuit was dismissed on January 28, 1985, on the ground that the case should be before this court. Affidavit of Margaret O'Connell, Sept. 10, 1987, ¶ 25. Plaintiff filed suit in this court on August 11, 1986.

## DISCUSSION

1. Plaintiff contends that her contract was breached when the ASCS refused her first payment under the Milk Diversion Program after she had complied fully with the contract requirements.[3] *Cf. Nutt v. United States*, 12 Cl.Ct. 345 (1987), *appeal docketed*, No. 87–1459 (Fed.Cir. July 13, 1987). However, defendant contends that there has been no breach because her eligibility for payment was conditioned on plaintiff's submitting the information on the production from her farm required by regulation. Plaintiff's "Contract To Participate in the Milk Diversion Program" provides: "The producer and the CCC agree that ... B. They shall comply with all terms and conditions of this contract and its appendix which is incorporated as a part of this contract." The appendix restates in a somewhat more straightforward fashion than do the regulations themselves the con-

tents of the applicable regulations, 7 C.F.R. §§ 1430.400–1430.422 (1985). Paragraph 17 of the appendix states that "[t]he regulations governing the Milk Diversion Program which are found at 7 CFR Part 1430 are incorporated as a part of this agreement." 7 C.F.R. § 1430.401(d) provides that "[n]o delegation herein to a State or county committee shall preclude the Administrator, ASCS, or a designee, from determining any question arising under the program or from reversing or modifying any determination made by a State or county committee." 7 C.F.R. § 1430.408(a) obligates the purchaser to make a specified reduction in the quantity of milk marketed for commercial use from the unit in order to be eligible for diversion payments. Finally, 7 C.F.R. § 1430.409(a) conditions eligibility for diversion payments on compliance with "all of the terms and conditions of the contract and this subpart."

■ Thus, the contract between plaintiff and the county committee reserved to the ASCS the authority to deny plaintiff's request for payment on the basis that she failed to qualify under the applicable regulation. No breach of contract can be maintained on the ground that the ASCS lacked the right by contract to determine plaintiff's eligibility for payment in the Milk Diversion Program.[4]

2. The Milk Diversion Program conditions eligibility for payment on the amount by which the producer reduces the milk sold commercially for the unit measured against a certain percentage of the milk commercially produced during a previous year or years. In order to participate in the program, a milk producer submits a

---

**3.** In her second cause of action, plaintiff asserts a claim for the unconstitutional taking of private property without compensation in violation of the fifth amendment to the United States Constitution. However, since plaintiff's motion for summary judgment failed to brief this claim, this count is deemed abandoned. *Sheets v. United States*, 2 Cl.Ct. 101, 102 n. 2 (1983) (citing cases).

**4.** This court's recent discussion in *Willson v. United States*, 14 Cl.Ct. 300, 305–307 (1988), treats the arguments that plaintiff alluded to or could have made that the Government is estopped from defending on the basis that plain-

tiff had performed under a contract that had been accepted by the county committee. *See also Morgan*, 12 Cl.Ct. at 251–52. It should be noted that in this case the question is not whether plaintiff qualified to participate in the Milk Diversion Program, but whether she was eligible for payment. The distinction is more substantial than semantic, as plaintiff could qualify today if she could make the showing required for payment. There is no suggestion that the ASCS at any level inhibited plaintiff's making the required showing. Rather, the issue between plaintiff and the ASCS was whether she could be required to make it.

milk reduction plan to a county committee. 7 C.F.R. § 1430.404. Section 1430.402(t) defines a producer as

> any person who is involved in, contributes to, or has any interest in any unit which is used for the production of milk and who shares in the risk and proceeds of the production of milk.

The plan must describe "the manner in which the producer intends to achieve a reduction in milk marketings," § 1430.404(1), and "the approximate number of dairy cows that will be sold for slaughter." § 1430.404(2). To be eligible for a contract under the program, any proposed reduction must "not be less than 5 percent nor greater than 30 percent of the milk base established for the producer's unit." § 1430.403(a); cf. 7 U.S.C. § 1446(d)(3)(B)(i) ("not less than 5 percentum nor more than 30 percentum, of the quantity of milk marketed by such producer for commercial use during the marketing history period"). The milk base is the sum, established in pounds, of milk marketed for commercial use during the base period for a unit. 7 C.F.R. §§ 1430.402(q), 1430.405(c), 1430.407. A base period can either be "calendar year 1982 or calendar years 1981 and 1982," at the producer's election. § 1430.402(c). A producer becomes eligible for payment under this contract

> only if the reduction in the quantity of milk marketed for commercial use from the unit during the contract period equals or exceeds [the] greater of: (1) The contract reduction less an amount equal to 3 percent of the milk base, and (2) 5 percent of the milk base.

§ 1430.408(a).

> 7 C.F.R. § 1430.402(w) defines a unit as the dairy cows, milk production facilities, and land used to produce milk which are identified on the form used to establish a milk base for the unit and approved by the county committee.

See also § 1430.403(a) ("The unit shall be identified by the producer at the time the producer requests the establishment of a milk base...."). The regulations provide no further definition of unit, and the statute itself does not contain the term "unit."

Defendant asserts that for the purposes of receiving payment under the Milk Diversion Program the reduction in milk production must include all of the milk production on the O'Connell's farm, including that of Mr. O'Connell's cows because both herds were housed together. As the agency put it, "The definition of a unit ... refers to the cows, milk production facilities and land used to produce milk. It is our judgment that only one unit is identified in this case...." Memorandum from State Executive Director to county committee (Apr. 27, 1984). Plaintiff argues that the unit only involved the dairy cows that she identified as her "unit" for purposes of the contract and not her husband's. According to plaintiff, "since the husband had no interest in the 'unit' unless he had an ownership interest in each and every component of the 'unit', including the herd, the husband is not considered to have an interest in the 'unit'." Plf's Reply to Court Questions, filed Dec. 17, 1987, at 1.

The statute establishing the Milk Diversion Program, 7 U.S.C. § 1446(d), uncharacteristically fleshes out in detail the requirements for participation in this program. Indeed, the regulations implementing the Milk Diversion Program, 7 C.F.R. §§ 1430.400–1430.422, although themselves detailed, do not purport to add much to the tightly drawn program requirements.

The Supreme Court set forth the prescription for judicial review of a regulation when the statute is as explicit as section 1446(d):

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the

absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted).

Consistent with *Chevron U.S.A.*, the issue becomes whether the ASCS's definition of unit is based on a permissible construction of the governing statute. *Chevron U.S.A.* further instructs:

"The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231 [94 S.Ct. 1055, 1072, 39 L.Ed.2d 270] (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute....

467 U.S. at 843–44, 104 S.Ct. at 2782 (footnote omitted). The Supreme Court has admonished that the agency's interpretation need not be the most reasonable interpretation or the interpretation which the court would have chosen in order to be entitled to deference. *Mourning v. Family Pub. Serv., Inc.*, 411 U.S. 356, 371–72, 93 S.Ct. 1652, 1661–62, 36 L.Ed.2d 318 (1973). Indeed, the administrative interpretation " 'becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–14 (1945)). If the agency's interpretation is deemed reasonable, the inquiry becomes "whether the decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment." *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

The only measurement for determining eligibility for diversion payments under the statute is a producer's marketing history. 7 U.S.C. § 1446(d)(3)(B)(i); *see also* §§ 1446(d)(3)(C), (F), (H), (J)(i), (O). The requisite marketing history data are specifically described in the statute:

The marketing history shall be the marketings of milk by such producer for commercial use during calendar year 1982 ... or, at the option of the producer, the average marketings of milk by the producer during calendar years 1981 and 1982....

§ 1446(d)(3)(F). Adjustments to this data are permitted only "to correct for abnormally low production resulting from a natural disaster or other condition beyond the control of the producer or such other factors as the Secretary determines necessary to provide a fair and equitable marketing history." *Id.*

■ The concept of "unit" in the regulations must be consistent with the concept formulated by Congress. Thus, a producer was required to propose as a "unit" all of the dairy cows, production facilities, and land attributable to the generation of the marketing data that served as the base for the reduction. No question exists that Mr. O'Connell's herd could not qualify as a unit under the Milk Diversion Program, since it was purchased two months into the base period, and, accordingly, no marketing history could be developed with respect to it. However, as will be discussed, the statute would not countenance plaintiff's position that Mr. O'Connell had no interest in her unit because he had no ownership interest in plaintiff's herd. Although Mr. O'Connell's herd was not a unit for purposes of putting his cows under contract, it is concluded that the production of his cows had to be included in plaintiff's contract reduction pursuant to 7 C.F.R. § 1430.408(a), as production "from the unit." There are two analytical approaches that support the agency's interpretation.

First, Mr. O'Connell signed plaintiff's contract under the caption "Other Unit." Defendant contends that Mr. O'Connell's signature is consistent with its argument that his dairy cows had to ·be included within the reduction in the quantity of milk marketed for commercial use from the unit. The regulation requiring Mr. O'Connell's signature, 7 C.F.R. § 1430.403(a), does not accomplish what defendant maintains. It does provide: "All persons who have an interest in the unit must execute the contract...." However, this requirement is to assure that "[a]ll such persons shall be jointly and severally liable on such unit for a failure to comply with the terms and conditions of the contract...." *Id.*[5] Since Mr. O'Connell had an interest in the production facility and land used by plaintiff's unit, he was required to execute the contract with plaintiff as a joint producer for her unit, *see* § 1430.402(t), not to identify himself as "Other Unit." The "Other Unit" designation was intended to identify other interests in which the producer, *i.e.,* plaintiff, had an interest.

■ Even if defendant's point is not well taken, plaintiff's theory that Mr. O'Connell had to own an interest in each of her cows, production facility, and land in order to make him a joint producer on her unit runs aground based on this regulation alone. The regulation stipulates that a joint producer holds "an interest" in the unit, which implies in any part of the unit. Grammatical gymnastics can be avoided to reach the same result by the observation that the purpose of this regulation is to impart some financial integrity to the program. Plaintiff's reading would eviscerate that purpose by immunizing a spouse from liability through the simple expedient of separately owned herds. As the next section of this discussion demonstrates, the regulations for the Milk Diversion Program carry out a detailed congressional prescription to prevent any circumvention of the requirements for net reduction in milk production.

The second approach looks at the statute and regulations as a whole. Both carry forward elaborate protective provisions

that ensure that once a producer signs a contract, he cannot defeat the purpose of the Milk Diversion Program by indirectly increasing his output. Thus, 7 C.F.R. § 1430.413(d), almost identical to 7 U.S.C. § 1446(d)(3)(J)(i), provides:

> In order to be eligible for payment, the producer shall certify that any reported reduction is a net decrease in the marketings of milk for commercial use from the milk base established for the unit and has not been offset by expansion of production and marketings in other production facilities in which the producer has an interest, by a transfer of partial interest in any production facility, or by employment of any scheme or device to qualify for a payment for which such producer would otherwise not be eligible.

7 C.F.R. § 1430.409(a)(3), almost identical to 7 U.S.C. § 1446(d)(3)(B)(ii), provides:

> Any production capacity of a milk production facility that becomes available for use because a producer reduces milk production in order to comply with the terms and conditions of the contract shall not be used by the producer, or made available by the producer for use by any other person, for the production of milk;
> . . .

7 C.F.R. §§ 1430.413(e), (f), which have no counterpart in the statute, impose a limitation on overall production of all commercial business and personal arrangements, including spousal:

> (e) The contract shall provide that the producer shall be ineligible for any payment under the contract if the total quantity of milk marketed for commercial use by the producer during the contract period from all units in which the producer has an interest and which are not the subject of a milk diversion contract exceeds the total quantity of such marketings during the period December 1, 1982, through November 30, 1983, with the marketings January through March 1983 being counted twice, from any unit in which the producers had an interest as of January 1, 1984, and which is not the subject of a contract.

---

5. The contract incorrectly recites that plaintiff owned "100%" of the unit.

(f) For purposes of this section a producer shall be considered to have an interest in any unit which consists in whole or in part of any land, equipment, production facility or dairy cows owned, leased or supplied, in whole or in part by: (1) The producer; (2) any partnership or joint venture other than a corporation of which the producer is a member; (3) any corporation in which the producer holds more than a 20 percent interest; (4) a spouse of the producer, a minor child of the producer, or legal guardian of the such minor child acting on behalf of such minor child; or (5) any trust in which the producer has an interest.

This regulation describes in the disjunctive the requisite interest in terms of land, production facility, or dairy cows. If the limitation on overall production did not reach the common types of interests specified unless they existed in every aspect of milk production, these regulations would not reach many interests, contrary to their express purpose.

Construed together the regulations—embarking from, but true to the letter and spirit of the statute—prevent the use of any capacity made available by a reduction contract, prevent increase of production in any other facility by a producer with a reduction contract, and prevent any increase in production by such producer taking into account all his interests. The regulations refer to the term "unit" as cows, production facility, and/or land. *Compare* 7 C.F.R. § 1430.403(w) *with* §§ 1430.413(d), (f). Since Mr. O'Connell's cows used the reduction unit's production facility, the production was includible with plaintiff's reduction contract as milk marketed for commercial use from the unit within the meaning of 7 C.F.R. § 1430.408(a).

Regarding the application of the regulation to the facts, plaintiff admits that she and her husband jointly owned the land and production facilities used to generate the unit's milk production and that Mr. O'Connell's herd produced milk during the relevant period. On this basis the ASCS's determination that the production of Mr. O'Connell's dairy cows had to be included within plaintiff's contract reduction was not arbitrary, capricious, or unreasonable.

Unfortunately, the calculus was never made during the lengthy administrative process. Perhaps plaintiff did not do so because she was aware that Mr. O'Connell's production, although reduced to some extent, rendered the farm's overall production above her contract reduction. However, the record is silent on point, and plaintiff should have an opportunity to present her data.

## CONCLUSION

Based on the foregoing,

IT IS ORDERED, as follows:

1. Defendant's cross-motion for summary judgment is denied without prejudice, and plaintiff's motion for summary judgment is granted to the extent consistent herewith.

2. Pursuant to RUSCC 60.1(a)(1), this case is remanded to the Secretary of Agriculture.

3. The Secretary of Agriculture shall render a decision by May 31, 1988, whether plaintiff met her contract reduction during the period prior to application for payment taking into account the milk production for Mr. O'Connell's herd.

4. Plaintiff's counsel shall be notified by March 15, 1988, of the name and address of the Secretary's designee. By March 15, 1988, the Secretary's designee also shall advise plaintiff's counsel of the type of information that should be submitted.

5. Plaintiff's counsel shall submit to the Secretary's designee by March 31, 1988, all information concerning the commercial milk production from plaintiff's and Mr. O'Connell's herds on their farm during the relevant period consistent with 7 C.F.R. §§ 1430.408(a), 1430.409(a)(1), 1430.412 (1985). The Secretary's designee may request supplemental information.

6. If plaintiff determines that Mr. O'Connell's production, in addition to her own, would have been in excess of her contract reduction, plaintiff's counsel shall advise defense counsel by February 29, 1988. The parties shall notify the court, and the remand order will be vacated forth-

with, summary judgment entered for defendant, and the complaint dismissed.

7. The Secretary shall file his decision on remand pursuant to RUSCC 60.1(b)(3).