ASSOCIATED MILK
PRODUCERS, INC.

v.

The UNITED STATES.

No. 718–88C.

United States Claims Court.

March 15, 1991.

Sydney Berde, St. Paul, Minn., for plaintiff.

Donald E. Kinner, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Terrence G. Jackson, Dept. of Agriculture, of counsel.

## OPINION

YOCK, Judge.

This case, involving the validity and applicability of the regulations implementing the milk price reduction provisions of the Food Security Act of 1985, is currently before the Court on the parties' cross-motions for summary judgment after oral argument. For the reasons discussed herein, the Government's cross-motion for summary judgment is granted, the plaintiff's motion for summary judgment is denied, and the complaint will be dismissed.

### Facts

This case concerns implementation of the milk price reduction regulations issued by

the Secretary of Agriculture as part of the statutory program to support the price of milk. *See* 7 U.S.C. § 1446(d)(2) (1982 & Supp. IV 1986); [1] 7 C.F.R. § 1430.340 *et seq.* (1987).[2] In carrying out this program, the Commodities Credit Corporation (CCC) is required to purchase all surplus milk produced in the United States. However, in the early 1980's, this price support program led to high milk production and a milk surplus. Consequently, Congress attempted to reduce the surplus by providing for milk assessments to be taken from the proceeds received by the country's milk producers. Thus, the Dairy Collection Program (DCP) was designed to drive down the production of milk by reducing the effective price received by the producers for their milk. In 1982, the Secretary of Agriculture first established regulations implementing the DCP. The heart of the instant dispute is the application of 7 C.F.R. § 1430.341 (1987) to the facts of this case, since that regulation defines exactly who is the "responsible person" who must pay the price reduction to the CCC.

The plaintiff in this lawsuit is the Associated Milk Producers, Inc. (AMPI), an association of dairy farmers that formed a cooperative for marketing their milk. The farmers are milk producers as well as members of the cooperative. In the usual course of events, AMPI acts as a sales agent to market the milk for its producer/members to a milk handler who purchases the raw milk and converts the milk into commercial dairy products. AMPI submits monthly reports to the CCC indicating the amount of milk it has marketed on behalf of its producer/members and the payments due to CCC under the DCP. AMPI then pays the CCC out of the proceeds it receives from the milk handler.

On April 15, 1986, the Director of the Dairy Division of the Agricultural Marketing Service (AMS), who is the Secretary of Agriculture's delegatee for collecting the milk price reduction funds, issued a notice

concerning payment of the price reduction. That notice, entitled "Notice to Persons Who Pay Dairy Farmers For Milk and to Dairy Farmers Who Market Milk of Their Own Production Directly to Consumers," indicated that:

> Under the law, the responsibility for sending the money to the CCC is imposed on each person paying individual dairy farmers for milk. This includes, for example, plant operators who make payments to individual dairy farmers, and cooperative associations who receive a lump-sum payment from a plant operator and then distribute the proceeds to their individual members.

During the relevant time period at issue, the assessment was $.52 per hundred weight of milk.

In the instant case, the cooperative marketing system failed to function as planned. In June and July of 1986, AMPI's producer/members delivered a total of 61,462,065 pounds of raw milk to several plants of Foremost Dairy, Inc. (Foremost), in and around the State of Texas. Unfortunately, Foremost never paid either AMPI or AMPI's producer/members for the milk. Sometime between the date of receipt of the milk by Foremost and the point when it was to pay for it, Foremost sought protection under the federal bankruptcy laws.[3]

As had been the practice, AMPI filed monthly reports for June and July of 1986 with the CCC that indicated the amount of milk marketed during that period, which included the over 61 million pounds of raw milk that had been delivered to Foremost. It also paid to the CCC the appropriate milk deduction money (*i.e.*, some $319,601.95) that was due from the producers for that period for the milk that was marketed to Foremost. Sometime after the middle of July, 1986, AMPI became aware that Foremost had not paid its June to July 15, 1986, milk bill and had come under the protection of the federal bankruptcy laws. Therefore,

---

**1.** All references to 7 U.S.C. § 1446 in this case will be to Supp. IV (1986).

**2.** The applicable regulations were published on April 3, 1986. 51 Fed.Reg 11526–30 (1986).

**3.** Apparently to this day, AMPI has not been paid for any portion of the milk delivered to Foremost during June and July, 1986.

on its next monthly report, it deducted the $319,601.95 that it had earlier paid to the CCC for the Foremost marketings, on the theory that it was only liable to pay to the CCC the milk deduction payments on the amounts of money it actually collected from its customers/handlers.

During this same period of time, AMPI decided to make payments to its member/producers that had actually delivered the milk to Foremost, notwithstanding the lack of payment by Foremost for the milk. Thus, all the producer/members of the association received their monthly payments for the months of June and July, 1986, reduced somewhat because of the lack of payments by Foremost. AMPI paid its producer/members for the months of June and July, 1986, using proceeds from other milk sales as the source of the funds for the payment.

After AMPI reduced the payments it made to CCC by $319,601.95 in view of Foremost's failure to pay AMPI for the milk, the CCC determined that AMPI had underpaid its obligation to the CCC. The Director of the Dairy Division of CCC so notified AMPI on January 5, 1987. AMPI initiated a timely request for reconsideration of the Director's decision on January 20, 1987, and the request was denied by letter dated May 15, 1987. AMPI filed a timely notice of appeal from the Director's decision with the AMS by letter dated May 28, 1987, seeking a reversal of the Director's denial of AMPI's request for reconsideration of the January 5, 1987 decision. A hearing on the appeal was held on June 25, 1987, in Washington, D.C. Thereafter, an agreement was reached in September, 1987, whereby AMPI would tender to the CCC the principal sum owed, without waiving its right to pursue an administrative appeal and to seek judicial review of the agency's action.[4]

By letter dated February 1, 1988, the AMS denied AMPI's administrative appeal. In pertinent part, the denial letter stated:

After reviewing the available information, we conclude that the Dairy Division Director's determination was appropriate. Section 1430.341(j)(1) of the Regulations Governing Reductions in the Price of Milk Marketed by Producers, April 1, 1986, to September 30, 1987, defines a "responsible person" as "[a]ny person who pays, or who is contractually or otherwise required to pay, a producer or a producer's successor for milk marketed by a producer for commercial use...." The milk in question that was delivered to Foremost in June and July 1986 was marketed by producers through AMPI for commercial use. Although Foremost failed to pay for the milk, AMPI paid the producers for such marketings. This action made AMPI the "responsible person" for this milk. As such, AMPI was required pursuant to § 1430.343 to make certain reductions in the price received by the producers for the milk and to remit to the CCC the funds represented by those reductions. The fact that the funds used to pay these producers did not originate from Foremost is irrelevant under the regulations. AMPI's obligation to the CCC arose when it made payment to the producers for the milk that the producers marketed for commercial use.

For the reasons stated above, we conclude that AMPI was obligated to remit to the CCC the $319,601.95 at issue. Therefore, AMPI's appeal is denied.

Thereafter, AMPI commenced an action in the United States District Court for the Northern District of Texas on March 18, 1988. The Government successfully moved for dismissal upon the grounds that this action was within the exclusive jurisdiction of the United States Claims Court, and the case was ordered transferred to the Claims Court on December 7, 1988. AMPI timely filed its amended complaint in this Court on December 28, 1988.

4. While the CCC originally assessed late payment charges, it agreed to waive these charges as part of the September, 1987, agreement.

*Discussion*

■ The plaintiff's claim is against the United States for money improperly extracted, and is founded upon an Act of Congress and/or regulation. Thus, the Claims Court has jurisdiction unless the Dairy Collection Program's jurisdictional provisions indicate otherwise. *United States v. Erika, Inc.,* 456 U.S. 201, 208–09, 102 S.Ct. 1650, 1654–55, 72 L.Ed.2d 12 (1982); 28 U.S.C. § 1491(a)(1) (1988).

The jurisdictional section of the statute is 7 U.S.C. § 1446(d)(5)(A). The section does not address the situation in which a person or business entity with whom the CCC has dealt brings an action against the United States. Since the statute is silent as to jurisdiction over such an action, the general jurisdictional statute, the Tucker Act, 28 U.S.C. § 1491, controls, and the claim for money judgment against the U.S. Government is properly brought before the Claims Court. *Parks v. United States,* 15 Cl.Ct. 183, 188 (1988). As this Court held in another case involving 7 U.S.C. § 1446(d), "while review is limited, it is not precluded in a case where plaintiffs allege that the Secretary has promulgated regulations inconsistent with the statutory scheme." *Grav v. United States,* 14 Cl.Ct. 390, 394 (1988), *aff'd* 886 F.2d 1305 (Fed.Cir.1989).

As earlier indicated, both parties have filed motions for summary judgment in this case. Both parties agree that there are no material facts in dispute and each contend that they are entitled to judgment as a matter of law. Since the Court agrees with the parties and further agrees that the issue to be decided herein involves a matter of law, the controversy is ripe for decision herein.

■ The central issue in this dispute is whether or not the regulations, as promulgated by the Secretary of Agriculture, are consistent with or have exceeded the scope of the statutory enactment involved here. The plaintiff has argued strenuously that the milk reduction payment regulations (or portions thereof) are beyond the scope and thus clearly contrary to the statute. AMPI contends that the broad definition that includes cooperative associations (*i.e.,* itself) within the scope of 7 C.F.R. § 1430.341, the regulation defining a "responsible person" who must pay the price reduction, is invalid as contrary to Congress's clear and unambiguous intent in passing the statute, 7 U.S.C. § 1446(d)(2). AMPI argues that Congress clearly intended that "responsible person[s]," who have to pay the CCC the milk reduction payments would be limited to *"handlers"* or *end users* who actually pay for the milk, and the source of the funds for the price reduction would be limited to the *proceeds* from the actual sale of the milk.[5] Thus, since the handler in this case (Foremost) never did pay the producer/members for the raw milk, there never were any proceeds of sale for AMPI from which to extract the milk reduction payments to send to the CCC. The fact that AMPI, out of the goodness of its heart, or as a volunteer, may have paid its producer/members for the milk marketed to Foremost (and all other customers) is irrelevant

5. A "handler" is defined in 7 C.F.R. § 1126.9 (1987) in the following manner:
"(a) Any person in his capacity as the operator of a pool plant;
"(b) Any cooperative association with respect to milk of a producer that is diverted for the account of the cooperative association from a pool plant of another handler in accordance with § 1126.13;
"(c) Any cooperative association with respect to milk that it receives for its account from the farm of a producer for delivery to a pool plant of another handler in a tank truck owned and operated by, or under the control of, such cooperative association, unless both the cooperative association and the operator of the pool plant notify the market administrator prior to the time that such milk is delivered to the pool

plant that the plant operator will be the handler for such milk and will purchase such milk on the basis of weights determined from its measurement at the farm and butterfat tests determined from farm bulk tank samples. Milk for which the cooperative association is the handler pursuant to this paragraph shall be deemed to have been received by the cooperative association at the location of the pool plant to which such milk is delivered;
"(d) Any person in his capacity as the operator of a partially regulated distributing plant;
"(e) Any person who is a producer-handler; and
"(f) Any person in his capacity as the operator of an other order plant described in § 1126.7(f)."

because it (AMPI) is not a handler or end user and never received any funds from which the milk reduction payments could be made. The source of the funds that ultimately were paid to the producers was not Foremost, but rather, all the other handlers that had paid their milk bills.

The Government's position is quite the opposite. The defendant contends that the Administrator of the Agricultural Marketing Service (AMS) acted rationally and within his statutory authority in determining that AMPI was required under the appropriate law and regulations to pay the CCC a price reduction for the milk it marketed in June and July of 1986, to Foremost. This is true, notwithstanding the fact that Foremost never did pay AMPI for the milk, because AMPI voluntarily paid its producer/members for the milk marketed to Foremost. When it paid its producer/members, it became the "responsible person" within the definition of the milk reduction program regulations that had to pay the milk reduction payments to the CCC in order to carry out the statutory mandate to reduce the return to the producer/members and to discourage the overproduction of milk. The Government argues that the regulations are entirely consistent with the statutory enactment and in no way exceed the scope of what Congress intended. The Government urges that the plain language of the statute is clear, conclusive, and unequivocal, and that Congress has specifically directed the Secretary to require that any person paying a producer for milk also pay a price to the CCC per hundred weight of the milk. Since Congress has clearly and specifically directed the Secretary to require any person paying a producer for milk to also pay the price reduction, the Secretary, using the discretion provided in the statute, properly and within the scope of his authority established regulations implementing the Dairy Collection Program and committed the responsibility for administering the program to the Agricultural Marketing Service.

In any case in which the intent of Congress in passing a statute is in issue, one must, of course, start with the words of the appropriate statute. *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *Grav v. United States*, 14 Cl.Ct. at 392; *Freese v. United States*, 6 Cl.Ct. 1, 17 (1984), *aff'd* 770 F.2d 177 (Fed.Cir.1985). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). *LSI Computer Systems, Inc. v. United States Int'l Trade Comm'n*, 832 F.2d 588, 590 (Fed.Cir. 1987).

As this Court has previously noted:

The applicable rule of statutory construction is the plain meaning rule. It states that if the language of the statute is plain, the court must enforce the statute based on its terms and need not consider other rules of statutory construction. The plain meaning rule must be applied to clear and unambiguous statutes even if the results are harsh or unjust, unless the interpretation is absurd. The court may not go beyond the written text and interpret an unambiguous statue to uphold a favorable policy result which is not supported by its terms. Words should be given their common and approved usage.

A party who opposes application of the plain meaning rule to a provision must show either that "some other section of the act expands or restricts its meaning, that the provision itself is repugnant to the general purview of the act, or that the act considered in *pari materia* with other acts or with the legislative history of the subject matter, imports a different meaning." *See generally*, 2A *Sutherland Stat. Const.* Section 46.01 (4th Ed. 1984 & Supp.1988).

*National Foundation, Inc. v. United States*, 15 Cl.Ct. 209, 211 (1988).

In the case at issue, the relevant sections of the statute, 7 U.S.C. § 1446(d), provide as follows:

(2)(A) During the period beginning on April 1, 1986, and ending on September 30, 1987, the Secretary shall provide for a reduction to be made in the price received by producers for all milk produced in the United States and marketed by producers for commercial use.

\* \* \* \* \* \*

(C) The funds represented by the reduction in price, required under subparagraph (A) to be applied to the marketings of milk by a producer, shall be collected and remitted to the Commodity Credit Corporation, at such time and such manner as prescribed by the Secretary, by each *person making payment to a producer for milk purchased from such producer*, except that in the case of a producer who markets milk of the producer's own production directly to consumers, such funds shall be remitted directly to the Corporation by such producer.

(D) The funds remitted to the Corporation under this paragraph shall be considered as included in the payments to a producer of milk for purposes of the minimum price provisions of the Agricultural Adjustment Act (7 U.S.C. 601 et seq.), reenacted with amendments by the Agricultural Marketing Agreement Act of 1937. [Emphasis supplied.]

In addition, the regulations at 7 C.F.R. § 1430.340 *et seq.* define the "responsible person" who must pay the price reduction to the CCC. In pertinent part, the regulations state:

§ 1430.340 General statement.

(a) *Purpose.* This subpart implements the provision of section 201(d) of the Agricultural Act of 1949, as amended by the Food Security Act of 1985 and the Food Security Improvement Act of 1986, under which the Secretary of Agriculture is required to provide with respect to milk marketed during the period of April 1, 1986, through September 30, 1987, for reductions in the price received by producers for all milk produced in the United States and marketed by producers for commercial use.

\* \* \* \* \* \*

§ 1430.341 Definitions.

For purposes of this subpart:

\* \* \* \* \* \*

(j) "Responsible Person" means:

(1) Any person who pays, or who is contractually or otherwise required to pay, a producer or a producer's successor for milk marketed by a producer for commercial use, except as otherwise prescribed in paragraph (j)(2) of this section. This includes a handler regulated under a Federal milk order to the extent of, but not limited to, payments for milk that are transmitted by the handler to a Market Administrator under such an order for transmittal by the Market Administrator to individual producers; and

(2) Any producer with respect to milk of the producer's own production who markets such milk for commercial use in the form of milk or milk products:

(i) To consumers either directly or through retail or wholesale outlets, or

(ii) To persons located outside the United States.

§ 1430.343 Required reductions and remittances.

\* \* \* \* \* \*

(b) *Remittances.* Each responsible person shall remit to CCC the funds represented by the reductions required by § 1430.343(a) by the last day of the month following the month in which the milk was marketed.

A common theme underlying all of plaintiff's arguments is that Congress has clearly and unambiguously intended that only "handlers" or end users such as, in this case, Foremost, that actually pay for the milk, rather than cooperative associations that market the milk to handlers, pay the price reduction. Plaintiff asserts this congressional intent is clearly reflected in both the language of the statute and in the legislative history, and thus, administrative constructions (*i.e.*, the regulations) may not be contrary to the clear congressional intent.

The plaintiff points specifically to the language contained in 7 U.S.C.

§ 1446(d)(2)(C) which states that the funds shall be collected and remitted to the CCC "by each person making payment to a producer for milk purchased from such producer * * *." The plaintiff contends that this language limits the *source* of the price reduction to the "payment * * * for milk purchased from such producer * * *." In other words, the price reduction must only be paid by a handler or end user, such as Foremost out of the funds that it has used to purchase the milk from the producers.

Unfortunately for the plaintiff's contention, however, the plain language used by the Congress simply is not that limiting. Instead of using the term "handler" or similar word, the Congress chose to use the very broad word "person." The Government appears to be closer on the mark when it argues that Congress deliberately chose to use a word which would encompass those circumstances (perhaps out of the norm) when a handler is not the person who ends up paying the producers for their milk. The purpose, after all, of the milk reduction program is to provide a financial disincentive to producer/members to limit their overproduction of milk in the future. What difference does it make then, when a volunteer, or someone like AMPI, steps in and pays the producer/members? It appears to the Court that the purposes of the congressional enactment would be frustrated if the plaintiff's arguments were to prevail. Congress used a broad general term in reference to the payor of the milk reduction and did not limit the source to the handler.

While the plaintiff strenuously argues that the regulations contravene congressional intent and statutory authority in not being limited to handlers who "purchase" (*i.e.*, by obtaining title to) the milk, there is no reference in the statute limiting its application to specific persons who pay for commercially marketed milk. The statute requires that "each person making payment to a producer for milk purchased from such producer" must remit the price reduction to CCC. 7 U.S.C. § 1446(d)(2)(C). The statute makes no reference to the person who received title for the milk or indicates that it has to be a handler. The

statute similarly fails to refer to either the price paid or the source of specific funds.

The plaintiff also argues, viewing 7 U.S.C. § 1446(d)(2)(C) and (D) together, that it was Congress's understanding that when producers sold their milk, under the regulatory provisions mandated by the Agricultural Marketing Agreement Act, the deduction would be derived from and included as part of the minimum price payments to a producer of milk required by the Act. Basically, it is plaintiff's position that since it is handlers that pay the minimum price to the CCC, the requirement for persons who pay producers to pay CCC the reduction in the price received by those producers in 7 U.S.C. § 1446(d)(2)(C) is limited by § 1446(d)(2)(D) to reductions from payments received by producers from administrators of federal milk orders who have been paid by handlers. Since no payments to plaintiff's members were ever received from Foremost for the June and July milk, no "minimum price" funds were available from which to deduct the price reduction claimed by CCC. Thus, since the plaintiff never "purchased" the milk by acquiring title to it, the reimbursement to its members from funds derived from the proceeds of other milk sales is not subject to the price reduction, since the payments were not made with respect to "milk purchased from such producer," 7 U.S.C. § 1446(d)(2)(C). In this instance, however, the Court agrees with the defendant that section 1446(d)(2)(D) merely defines how the required price reduction is to be considered in relation to the minimum price provisions and should not be read to so limit section 1446(d)(2)(C).

Since the language of the statute itself is more supportive of the Government's position herein than the plaintiff's position, the plaintiff would have the Court examine the legislative history for its direction. Plaintiff has cited several sections from the legislative history in support of its position that Congress intended "responsible person[s]" to be limited to "handlers." For example, the Committee Report, which was submitted to Congress when the bill that

became the 1983 Act (the Dairy and Tobacco Adjustment Act) was under consideration, stated that the purpose of the milk price reduction provision was:

> To encourage producers to adjust their milk production to levels consistent with national demand, the bill would require the Secretary to provide for a 50–cent per hundredweight reduction in the price *received by producers for all milk marketed commercially* during the period * * *. *The funds* generated by this reduction in the price of milk *would be collected* and remitted to the Commodity Credit Corporation *by milk handlers* * * *.
>
> Proceeds from the deduction must be credited by CCC to the Dairy Stabilization Settlement Fund for use in making diversion payments to producers.

S.Rep. No. 163, 98th Cong., 1st Sess. 1–2 (1983), *reprinted in* 1983 U.S.Code Cong. & Ad.News 1658, 1659 (emphasis added).

Also, the Committee Report accompanying the Food Security Act of 1985 (H.R. 2100)[6] introduced the legislation with the following:

> The purposes of this bill is [sic] simple. It is to provide, as far as it can be done in legislation of this kind, the basis for an economic climate in which efficient American family farmers can survive the grim squeeze that has already driven too many of them to or close to the brink o[f] ruin.

H.R.Rep. No. 271, 99th Cong., 1st Sess. 8 (1985), *reprinted in* 1985 U.S.Code Cong. & Ad.News 1111.

Additionally, the Committee Report prepared by the House Committee on Agriculture in connection with that Committee's review of H.R. 2100 made the following observations about the revised price reduction provisions:

> *Reductions in the price of milk:* The Secretary would be required to provide for a reduction in the price of milk received by producers, applicable to all milk marketed for commercial use * * *.

> The funds represented by the reduction in the price of milk would be collected and remitted to the CCC by *handlers that buy milk from producers.* * * *
>
> Funds remitted to the CCC under a reduction in the price received by producers would be considered as included in the payments to producers for purposes of the minimum price provisions of the Agricultural Adjustment Act.

H.R.Rep. No. 271, 99th Cong., 1st Sess. 203–04 (1985), *reprinted in* 1985 U.S.Code Cong. & Ad.News 1103, 1306–07 (emphasis added).

From these portions of the legislative history, the plaintiff attempts to bolster its position that Congress clearly intended that only handlers could pay the milk reduction payments from the funds it paid to the producer/members. To counter the plaintiff's legislative history citations, the Government presents an example of a congressional report that used the term "person" rather than "handler." For example, Congress described this statute as including a provision for milk assessment which provides that "the funds shall be collected in a time and manner as specified by the Secretary and are remitted to the CCC by *each person* making payment to a producer for milk purchased." H.R.Rep. No. 271, 99th Cong., 1st Sess. 359, *reprinted in* 1985 U.S.Code Cong. & Ad.News 1463 (emphasis added).

The plaintiff has cited *Ocean Drilling & Exploration Co. v. United States,* 220 Ct.Cl. 395, 403, 600 F.2d 1343, 1347 (1979), for the proposition that there is no rule of law forbidding a court from resorting to the legislative history to determine the intent of Congress no matter how clear the statute may appear. While the plaintiff has provided several references to handlers, "fragments of legislative history cited by respondents, regardless of how liberally they are construed, do not amount to a clearly expressed legislative intent contrary to the plain language of the statute."

---

6. The Dairy Collection Program, which was part of the Dairy and Tobacco Adjustment Act of 1983, was not the only program designed to decrease milk production. As part of the Food Security Act of 1985, Congress also set up other programs such as the Milk Diversion Program (MDP) and its successor, the Dairy Termination Program (DTP) that provided, *inter alia,* for a decrease in milk production.

*American Tobacco Co. v. Patterson*, 456 U.S. at 75, 102 S.Ct. at 1540. Similarly, as the *Ocean Drilling* court itself noted, "this court will not bend or strain the words of a statute to change its meaning unless there is a *persuasive and clear showing* that Congress did not intend for the letter of the statute to prevail." 220 Ct.Cl. at 403, 600 F.2d at 1348 (emphasis added).

In any event, in view of the limited references to "handlers" or "persons" in the legislative history, the fact that the differences between the specific terms "handler" and "person" were not discussed, and neither term was used exclusively, this Court cannot conclude from the legislative history cited that Congress clearly intended to be limited to "handlers" and/or payment from the proceeds from the sale of milk. More tellingly, Congress subsequently incorporated the term "person," rather than "handler," into the statute. Accordingly, the Secretary's definition of "responsible person" in 7 C.F.R. § 1430.341 does not, at least on its face, frustrate congressional intent or exceed statutory authority.

Throughout the plaintiff's presentation, it has argued that the Court must read the statute in a way that effectuates, rather than frustrates, the major purpose of the legislative draftsmen. *Dep't of Defense, Army–Air Force Exch. Serv. v. Fed. Labor Relations Auth.*, 659 F.2d 1140, 1160 (D.C. Cir.1981), *cert. denied*, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982). Thus, plaintiff concludes that if a handler fails to pay, no reduction should be made to the reimbursement received by the producer. However, since the purpose of the statute is to reduce the price received by the producers and provide a disincentive to overproduce milk, if plaintiff's interpretation is correct, this would void the reduction mandated by the statute and frustrate the purpose of the law. The reason this would frustrate the purpose of the law is that the producers receiving either the "payment" or "reimbursement" would be receiving the unreduced milk price and thus would still have an incentive to overproduce milk.

This brings the Court back, again, to what it believes plaintiff's argument is:

that the Secretary exceeded the scope of his authority, and thus, his acts (*i.e.*, the regulation and the eventual denial of AMPI's appeal by the Agricultural Marketing Service based on the regulation) are not entitled to deference.

■ An agency's construction of a statute will be entitled to deference unless it contravenes the will of Congress. *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 233, 106 S.Ct. 2860, 2867, 92 L.Ed.2d 166 (1986). The Court in that case went on to quote *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984):

> [I]f a statute is silent or ambiguous with respect to the question at issue, our longstanding practice is to defer to the "executive department's construction of a statutory scheme it is entrusted to administer," *Chevron, supra*, 467 U.S., at 844 [104 S.Ct. at 2782] unless the legislative history of the enactment shows with sufficient clarity that the agency construction is contrary to the will of Congress.

*Japan*, 478 U.S. at 233, 106 S.Ct. at 2867. Thus, this Court agrees with the defendant that even if the statutory language applicable here could be considered ambiguous, the Secretary's construction of the Dairy Collection Program must be given deference. Keeping in mind that even under the best of circumstances "[g]oing behind the plain language of a statute in search of a possibly contrary congressional intent is 'a step to be taken cautiously,'" this Court notes that there is very little in the legislative history to suggest that the plain language of the statute does not mean what it says. *American Tobacco Co. v. Patterson*, 456 U.S. at 75, 102 S.Ct. at 1540, quoting *Piper v. Chris–Craft Indus., Inc.*, 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977).

As this Court has previously held regarding this same statute, "[t]he Supreme Court set forth the prescription for judicial review of a regulation when the statute is as explicit as section 1446(d): * * * 'if the statute is silent or ambiguous with respect

to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *O'Connell v. United States,* 14 Cl.Ct. 309, 314–15 (1988), quoting *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted).

The agency's interpretation need not be either the most reasonable interpretation or the one the Court itself would have chosen. *Mourning v. Family Pub. Serv., Inc.,* 411 U.S. 356, 371–72, 378, 93 S.Ct. 1652, 1661–62, 1665, 36 L.Ed.2d 318 (1973). This interpretation controls unless it is "plainly erroneous or inconsistent with the regulation." *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).

Assuming *arguendo* that the plaintiff is correct in that only the final purchaser should be required to remit the price reductions to CCC, and thus, the regulation is stricter than the empowering provision of the statute, regulations that are stricter than the statute are still lawful and binding if they are reasonably related to accomplishing the purpose or objective of the program. *Mourning v. Family Pub. Serv., Inc.,* 411 U.S. at 369, 371, 93 S.Ct. at 1660, 1661.

The purpose of the program is to provide a disincentive to overproduce milk by reducing the price received by the milk producers. The Congress itself used the term "person" instead of "handler" in terms of who must pay. Thus, the regulations merely correspond to the imperatives and purposes of the statute. The regulations at issue here do not exceed the scope of the statute or the congressional intent. The Secretary's regulations exhibit a permissible construction of the statute and are reasonably related to the objectives of the program. The question then becomes "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). This Court does not find a clear error of judgment in the Administrator's decision. In fact, the Court finds that the Administrator of the Agricultural Marketing Service (AMS) acted rationally and within his statutory authority in determining that AMPI was required under the law and regulations to pay the CCC a price reduction for the milk it marketed in June and July of 1986 to Foremost.

■ The plaintiff has also raised an issue of whether the Secretary's act in requiring payments to the CCC in this case amounts to arbitrary and unreasonable action. Although the plaintiff's argument in this regard is somewhat unclear, the Court assumes that the plaintiff is attempting to argue (regardless of the outcome of the plaintiff's scope argument) that the results are unfair and unreasonable to the plaintiff's producer/members that already have received nothing from Foremost for their milk and now have to pay a further price reduction.

The plaintiff quotes *Evcco Leasing Corp. v. Ace Trucking Co.,* 828 F.2d 188, 195 (3rd Cir.1987) to support its position: "Statutes must be interpreted to receive a sensible construction, limiting application so as not to lead to injustice and oppression, presuming that the legislature intended exceptions to avoid such consequences." If the plaintiff is using this quote to support its position that it is unfair and unconscionable to apply the regulation to the facts of this case, this Court can only respond that Congress sets up the price reduction program (or any subsidy program for that matter), and Congress can set whatever conditions it deems necessary.

Furthermore, plaintiff presupposes that the legislature intended certain exceptions. As a general point with respect to congressional intent and the application of the regulations to the facts of the instant case, the mere fact that the application of the regulation results in less money for plaintiff's producer/members is not indicative of a violation of the statute. Despite plaintiff's arguments concerning the harshness of the

result, as one court has noted with respect to this specific statute, "[i]t is clear, however, that Congress was aware of the possibility of harsh results to some small farmers." *South Carolina v. Block*, 717 F.2d 874, 888 (1983), *cert. denied*, 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984). That court went on to say "[w]e may well consider the tool given the Secretary to be blunt, and its use by the Secretary to effectively drive some producers 'out-of-business' to be harsh as it applies to small dairy operations. * * * Were we the Secretary, we might well have searched long for a more humane alternative, but our judicial task is not to substitute our judgment for that of the administrative agency." *Id.* Thus, once Congress has set up a program and various conditions for administering it, unless plaintiff can provide some evidence that the regulation is being applied in a discriminatory manner, the Court may not interfere. Plaintiff's unfairness argument fails.

 The plaintiff also seems to be raising an Administrative Procedure Act (APA), 5 U.S.C. § 553 (1982), issue. The plaintiff believes that the Secretary had to publish, for notice and comment, the "changes" that plaintiff believes occurred in the 1987 regulations from the 1983 regulations. Aside from the fact that the regulations appear to be totally exempted, under section 102 of the Food Security Act of 1985, from the notice and comment provisions of the APA,[7] there does not appear to be any substantial departure or change in course from the 1983 regulation in the 1987 regulations at issue that might require further notice or comment.[8] To the extent that the plaintiff is still pressing this issue, the matter is decided against the plaintiff's position.

In summary, the Court concludes that the regulation is consistent with the intent of Congress and is not contrary to the statute, since Congress did not clearly intend to limit the application of the milk reduction provisions only to handlers that actually paid for the milk. Even though Foremost Dairy, Inc., never actually paid for the milk, a failure to subject the plaintiff's reimbursement to the milk price support provisions would undermine the underlying purpose of the statute by lessening the incentive to overproduce milk. The Administrator's decision is rational and within the bounds of his statutory authority.

## CONCLUSION

For the reasons discussed herein, the defendant's cross-motion for summary judgment is granted, the plaintiff's motion for summary judgment is denied, and the plaintiff's complaint will be dismissed.

Each party is to bear its own costs.

---

7. *See* Section 102 of the Food Security Act of 1985, Pub.L. No. 99–198, 99 Stat. 1354 (1985).

8. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42, 57, 103 S.Ct. 2856, 2866, 2874, 77 L.Ed.2d 443 (1983).